# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIANNE J. MILLER and ROBERT N. MILLER and LISA M. SHANIKA, | ) | |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) | Case No. 03-2489L |
| | ) | Sr. Judge Eric Bruggink |
| Plaintiff, | ) | |
| vs. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF SETTLEMENT**

LATHROP & GAGE, L.C.
Mark F. Hearne, II
J. Robert Sears
10 S. Broadway, Suite 1300
St. Louis, MO 63102-1708
TEL (314) 613-2500

TABLE OF CONTENTS

I. Summary of Settlement....................2

1. How the Class Was Formed And How Each Members' Right To Compensation Was Established....................2

2. How The Value Of Each Class Member's Property Was Determined....................4

3. How The Delay Damages Were Determined....................9

4. How Payment Of The Attorney Fee and Expenses Was Determined....................10

5. Every Class Member Has Been Provided Full Details Of The Settlement, Had Opportunity To Fully Consider The Terms Of the Settlement And (##) Class Members Have Expressly Consented to This Settlement And Only __ Have Objected....................13

II. One Third of the Common Fund is The Appropriate Measure of Class Counsel's Attorney Fee....................14

1. This Court Has Approved An Attorney Fee Of 34% Of The Common Fund (Including The URA Attorney Fee Amount) In A Very Similar Missouri Trails Act Taking Case....................16

2. One Third Of The Common Fund Is A Typical Percentage For An Attorney fee in Common Fund Cases....................18

3. The Supreme Court Has Held That The Common Fund Upon Which An Attorney Fee Is Calculated Should Include The Full Fund Obtained For The Benefit Of The Class....................19

4. That Portion Of The Recovery That Was Obtained Under Fee-Shifting Statutes Should Be Included In The Common Fund Upon Which The Attorney Fee Is Calculated....................21

5. The Lodestar Amount Does Not Fairly Compensate Class Counsel....................23

A. Lodestar Does Not Compensate Counsel For The Delay in Payment....................26

B. The Lodestar Fee Does Not Compensate Class Counsel for the Substantial Risk of Non-Payment....................27

III. Response to Class Members' Objections to Damage Awards....................28

1. The Single Class member's objection To Calculation Of Attorneys' Fees....................28

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| DIANNE J. MILLER and ROBERT N. MILLER and LISA M. SHANIKA,<br><br>For Themselves and As Representatives of a Class of Similarly Situated Persons,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br>Defendant. | Case No. 03-2489L<br><br>Sr. Judge Eric Bruggink |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF SETTLEMENT**

## I. INTRODUCTION

The counsel for the class and for the United States have agreed to a settlement of this case. This Settlement has been approved by the United States and is a resolution that counsel for the class believes to be fair and appropriate for the individual property owners that are the class members. This settlement is a final settlement and resolves all outstanding claims and issues in this case. This Settlement is set for a Rule 23(e) hearing in St. Louis at 9:00 am on Wednesday, November 15th.

Eighty Three class members have expressly consented to the Settlement as fairly compensating them for the government's taking of their property. No class member has objected to the amount of compensation paid under this Settlement for the taking of their property. One class member raised some procedural questions concerning his ex-wife's receipt of her portion of the compensation and a second class member objected to calculation of the attorney fee. The class member objecting to the calculation of the attorney fee proposes a method by which the attorney fee is calculates such that he receives an additional $6,400. Class counsel does not believe that either class member raise any basis for this court to not approve the Settlement. We

explain below the terms of the Settlement, how it was achieved and why we believe it should be approved.

## II. Summary of Settlement

### 1. How the Class Was Formed And How Each Members' Right To Compensation Was Established

The United States took a portion of that property owned by those St. Louis County Missouri landowners who held fee title to the land over which the abandoned Carondelet Branch railroad once ran. In August 1999 an easement for a public access recreational trail and for future railroad use was imposed upon this property. This public access easement was created by operation of the federal Rails-to-Trails Act, 16 U.S.C. § 1247(d) ("Trails Act"). The Fifth Amendment of the United States Constitution requires that the United States pay these landowners for the taking of their property. *Preseault v. United States*, 494 U.S. 1 (1990) *Glosemeyer v. United States*, 45 Fed. Cl. 771 (2000).

The named Plaintiffs, Robert and Diane Miller and Lisa Shanika retained Thor Hearne and his law firm, Lathrop & Gage, to be their legal counsel representing them in their claim seeking compensation for the taking of their property. Plaintiff's counsel agreed to undertake this representation according to terms of a contingent fee agreement providing that counsel would receive one-third of the total recovery received for the property owners. (Attached as Exhibits "6" and "7")

Plaintiff's counsel successfully sought to have this action certified as a class action in which Mr. Hearne and his firm were designated as class counsel. The class was certified as an opt-in class and a notice was sent to all potential class members and published in two local newspapers. Potential class members could elect to participate only by completing and

submitting an “Entry of Appearance” form approved by this Court. A total of 115 Entries of Appearance were filed by property owners seeking to become part of the class.

Class counsel’s representation of the class during the initial claim validation process involved extensive research into historical land title records concerning the establishment of the original railroad easement in 1872 and subsequent transfers of title to the present day property owners. This also required that class counsel review numerous utility corridor licenses and crossing easements and all other purported legal instruments affecting the more than two mile long abandoned railroad corridor. In addition to establishing each class member's legal title to the property, class counsel was also required to establish the physical dimensions of each parcel.

Determining each class member’s title (and defining the nature of the interest relative to other competing interests in the corridor) involved extensive legal and factual research. For each class member and each parcel, class counsel assembled the relevant historical and title research establishing that the class members held fee title to the property on the date of taking and as well as defining the nature and physical dimensions of the property. This involved obtaining surveys and tax assessment records for each separate parcel as well as other documents from property owners and public records. This information was assembled into a “Claim Book” that was provided to the United States. The Justice Department, on behalf of the United States, then reviewed and researched this title information in the "Claim Book." This process of determining and defining each class member’s title to the property along this corridor was a difficult, costly and time-consuming process.

Of the total of 115 Entries, the United States determined to challenge some claims and prevailed in its challenge to 19 claims that were dismissed by this Court. Those claims which

were dismissed were dismissed because the claimant did not hold fee title to the property upon which the easement was imposed[1] or did not hold title to the property on the date of taking.[2]

A total of 93 owners holding title to 95 separate parcels of property remained as class members at the conclusion of this title review and challenge process. Those remaining class members are the ones who are parties to this Settlement.

### 2. How The Value Of Each Class Member's Property Was Determined

Once each property owner's title to their respective property was established – and any challenge to that title by the Justice Department was resolved -- the class counsel proposed, and the Justice Department agreed, to use a common appraiser to establish the value of each parcel of property on the date of taking. Counsel for class and the United States agreed upon a procedure for the common appraiser to conduct this initial valuation. Both parties reserved the right to object to the value determined by the common appraiser. This Court approved this common appraiser procedure.

Counsel for the class and the United States each proposed a list of three appraisers. Counsel for both parties jointly interviewed each of these six appraisers and independently evaluated their experience and qualifications. Out of this list of six, the counsel for both Plaintiffs and the United States agreed to use Matt Burghoff. Mr. Burghoff was one of the appraisers nominated by the United States to be the common appraiser. Mr. Burghoff is a professional appraiser and is a Missouri Certified General Appraiser and Illinois Certified General Appraiser. Mr. Burghoff and his firm have extensive appraisal experience in Missouri and especially in the area of St. Louis County where the Carondelet Branch is located.

[1] For example, St. Louis County Library and Oak Bend I, LLC who derived common source of title from a "Triplett Deed" that this Court determined on August 31, 2005 had conveyed fee interest to the Pacific Railroad

[2] By order dated November 2, 2005.

Plaintiff's counsel provided Mr. Burghoff with the "Claim Book" and detailed title and property information for each of the 95 individual parcels. Together, class counsel and government counsel instructed Mr. Burghoff on an agreed methodology to use in determining the value of each class member's property interest taken by operation of the Trails Act.

Upon his selection as the common appraiser, Mr. Burghoff began the valuation of the property. Mr. Burghoff initially evaluated each of the properties and developed a list of valuation groups and sub-groups. The valuation groups were based upon the character and use of the property and included, for example, residential, commercial, and office categories. Within each of these groups certain sub-groups were developed. The sub-groups were developed for properties that shared common valuation characteristics. For example, a residential subdivision with a number of similar adjoining or nearby homes of similar size, style and age would be a sub-group of the residential group. Another example was the Watson Industrial Park in which similar office-warehouse properties were part of a sub-group of the commercial property.

Within each sub-group, Mr. Burghoff identified "representative parcels." A representative parcel was one that Mr. Burghoff considered a good proxy for the other properties in the valuation sub-group because it shared a common use, zoning, similar improvements, and other significant features with the other properties in the sub-group. Mr. Burghoff also identified a number of "unique parcels" that did not share common valuation features with any other property. Examples of the unique parcels were the Father Dickson Cemetery and the City of Crestwood's historic Sappington House Restaurant and Tearoom properties which each possessed a unique location or other features not common to any other property.

Mr. Burghoff then provided this list of property groupings, sub-groupings and designated "representative" and "unique" parcels to counsel for the United States and counsel for the

property owners. Counsel for each party independently reviewed this list of property groupings. Counsel had a number of joint conference calls with Mr. Burghoff to discuss his evaluation of the properties and the reasons for each property being assigned to the respective categories. Counsel for the class made a number of visits to the properties and had numerous discussions with property owners about their property. After their independent review and evaluation, counsel for both parties agreed to the property categories and groupings proposed by Mr. Burghoff.

There were a total of 24 properties designated as either a “unique” or a “representative” property. Each of these “unique” and “representative” properties was fully appraised by Mr. Burghoff and for each an appraisal report was prepared. The appraisal methodology employed by Mr. Burghoff (and the appraisal reports that he prepared) was consistent with those standards established in the “Uniform Appraisal Standards for Federal Land Acquisition” manual developed by the Interagency Land Acquisition Conference.[3] (The “Yellow Book”) and the Uniform Standard of Professional Appraisal Practice (USPAP).

Specifically, Mr. Burghoff was asked to determine the “value of the subject [property] before and after the imposition of an easement”.[4] This “before and after” standard was agreed to

---

[3] The Interagency Land Acquisition Conference which developed and revised the Yellow Book was chaired by the former Assistant United States Attorney General Lois Schiffer.

[4] More fully Mr. Burghoff "was retained to appraise the subject property before and after imposition of the easement defined as follows was acquired:

> An exclusive and assignable easement and right-of-way for interim use as a recreational trail, subject to restoration and/or reconstruction of the railroad right-of-way for the purpose of reactivation of rail service, pursuant to 16 U.S.C.§ 1247(d) and 49 C.F.R.§ 1152.29.
>
> The rights granted herein specifically include the right to locate, relocate, construct, operate, maintain, manage, replace and/or remove improvements and appurtenances associated with the operation and maintenance of a recreational trail. Also, included within the rights granted by this easement is the right to permit members of the public to traverse the easement subject to limitations which may be established from time to time by the United States, its successors and assigns. Also included is the right to trim, cut, fell and remove underbrush, obstructions, and any other vegetation, structures, or obstacles within the easement area.

by both parties as the measure of compensation due each property owner as of the date of taking. Mr. Burghoff determined this value for each appraised "unique" and "representative" parcel and provided a lengthy appraisal report documenting the basis for his valuation of each "unique" and "representative" property.

Class members whose properties were appraised were involved in the appraisal process. Copies of the appraisals were provided by class counsel to the owners of the appraised parcels and comment from them was sought and considered by Plaintiffs' counsel and by Mr. Burghoff. Copies of each final appraisal report were provided to both parties' counsel for their independent review and evaluation.

Mr. Burghoff then prepared a schedule with the value of the property taken for each of the 95 properties. The value of the interest taken by the government in each "unique property" was the amount determined by the appraisal of that specific property. The value of the interest taken by the government in each "representative property" was the amount determined by the appraisal of that specific property. The value of the interest taken in each property that was not directly appraised was determined by Mr. Burghoff using the value of the properties in that same sub-group that were appraised. The square foot value determined for the representative property (or properties) in each sub-group was used as a basis for valuing the interest in the other sub-group properties. This square-foot value was than adjusted for each other property based upon different size and other characteristics of each specific property.

This complete schedule of property values was then provided by Mr. Burghoff to both parties' counsel. This schedule of property values was independently reviewed by counsel for

---

The plaintiffs shall have the right to enter upon and use the easement area to the same extent an in the same manner as members of the general public. If the plaintiffs desire any rights in excess of the rights of the general public to use and access the above-described easement, the plaintiffs may request such rights from the owner or the authorized trail operator (Currently, St. Louis County Parks)."

the plaintiffs and by the Justice Department. Counsel had a number of joint conference calls with Mr. Burghoff to discuss specific points about each property and any adjustments made by Mr. Burghoff.

Counsel for the class conducted an extensive independent review of Mr. Burghoff's appraisals and proposed property valuations. This independent review included multiple visits by class counsel to the properties, detailed review of the appraisal reports, independent research using St. Louis County Assessor records, comparable property sale and tax records available through MetroScan and numerous discussions with appraisers and real estate brokers and individual property owners. Because Mr. Burghoff was acting as a common appraiser performing this property valuation, counsel for Plaintiffs undertook a far more extensive review and evaluation of Mr. Burghoff's proposed valuations than would have been undertaken had Mr. Burghoff been an appraiser working exclusively as an expert on behalf of the Plaintiffs.

The Government also independently reviewed Mr. Burghoff's appraisal report and submitted his proposed schedule of property values to another appraisal expert retained separately by the Justice Department. This separate expert independently reviewed Mr. Burghoff's work for the Justice Department and advised the Justice Department.

After this extensive independent review of Mr. Burghoff's appraisal reports and the schedule of property values that Mr. Burghoff developed, Plaintiff's counsel proposed settlement of this case with both parties adopting the complete schedule of those property values proposed by Mr. Burghoff. After its review of the property values, the Justice Department agreed to this settlement of the property value.

The Settlement proposed for this Court's approval adopts as the compensation due each property owner that value established by this valuation process. The complete schedule of each

property owner's specific compensation amount is specified on the schedule attached to the "Proposed Settlement" as Exhibit "1". The aggregate total value of the property interest taken from all property owners is $4,691,244.00.

No class member has objected to the property valuation process or the amount provided in the Settlement as compensation for the taking of their property. Eighty Two class members expressly consented to the Settlement and to the compensation they will receive under the Settlement and Ninety One class members did not object.

### 3. How The Delay Damages Were Determined

This Court determined, and the Government agreed, that the property owner's interest in their land was taken on August 18, 1999. It is now November, 2006 and payment of compensation has not yet been made. The parties could not agree upon the appropriate amount of money to compensate the Plaintiffs for the United States' delay in providing them their constitutionally mandated compensation so this issue was presented to the Court by way of motions for partial summary judgment. The Government proposed a rate of interest equal to the 52-week T-bill adjusted annually on the date of taking and compounded annually. The Plaintiff's proposed a rate of interest equal to the average of the Moody's index of corporate bond rates compounded annually. On August 22, 2006, this Court ruled that the appropriate rate of interest is equal to the Moody's Aaa rate for the period from the date of taking until compensation is received by the property owners and that this interest is to be compounded annually.

The Settlement provides for a total delay damages amount of $2,690,438.73. This was determined using the rate established by the Court and accruing interest from the date of taking through December 18, 2006. The sum certain total amount of $2,690,438.73 was used because a fixed and certain amount is easier to process for final payment than an uncertain per diem

amount. The delay damages were calculated through December 18, 2006 because that was the date by which counsel for the parties anticipated final payment of the Settlement amount would be made by the U.S. Treasury to the class counsel's trust account for distribution to each individual class member.

The total interest of $2,690,438.73 was calculated using the interest rate equal to the Moody's Aaa rate in effect on the August 18, 1999 taking date and each year thereafter ranging from 5.09 to 7.55. The total amount of interest attributed to each class member is specified in Exhibit 1 to the "Proposed Settlement."

No class member has objected to the calculation of the interest portion of the Settlement. Eighty Two class members expressly consented to the Settlement and to the determination of the delay damages they will receive under the Settlement and Ninety One class members did not object.

### 4. How Payment Of The Attorney Fee and Expenses Was Determined

Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice testified before the U.S. House Judiciary Committee, Subcommittee on Commercial and Administrative Law on June 20, 2002 in a hearing on litigation and its effect on the Rails-to-Trails program. In his testimony, Assistant Attorney General Sansonetti noted the significant effort that is involved in resolving Trails Act takings claims.[5] Assistant Attorney General Sansonetti noted that, "These cases require a deed-by-deed

[5] Assistant Attorney General Sansonetti testified,

> "[The] Supreme Court has repeatedly recognized that takings analysis is highly fact-specific and ad hoc.
>
> In our experience, this is equally true of the analysis in the rails-to-trails context, i.e., liability in rails-to-trails cases turns on the specific language of each individual deed conveyance, while damages analysis will depend on the specific physical characteristics of each individual property interest ***
>
> Each of these results in significant expenditures of time and resources, and complicates our ability to resolve cases and ensure that truly deserving landowners receive just compensation in as expeditious manner as possible.

liability analysis and a parcel-by-parcel valuation analysis. Therefore, while a class action of 1,000 individuals may technically constitute just one case, they in reality must be defended as if they were 1,000 separate cases." Counsel for the class agrees. Representing the interests of the almost 100 property owners in this case was both time-consuming and expensive.

Class counsel spent more than 4,800 hours working on behalf of the class members over a course of more than 4 years. (See, affidavit of class counsel Mr. Hearne, Exhibit 5) Class counsel incurred more than $40,000 in out-of-pocket expenses on behalf of the Class. To date, class counsel has been paid nothing for their work on this case. Using a lodestar method to determine the current hourly rates for litigation in the U.S. Court of Claims, class counsel's hourly fee would exceed $1,900,000.[6] The Government contended that the Government's liability under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq. (the "URA") should be calculated using the historic (not current) hourly rates prevailing in St. Louis and not Washington, D.C. forum rates. Using the historic St.

---

The defense of the rails-to-trails cases poses special challenges for the Environment Division. Although the total potential monetary exposure from these cases is only about one per cent of the total potential monetary exposure of the entire takings litigation docket presently being handled by the Environment and Natural Resources Division, three of the nine attorneys assigned to our "Takings Team" devote the majority of their time to these cases, along with two others who devote a considerable portion of their time as well. These cases require a deed-by-deed liability analysis and a parcel-by-parcel valuation analysis. Therefore, while a class action of 1,000 individuals may technically constitute just one case, they in reality must be defended as if they were 1,000 separate cases.

These cases also impose disproportionate expert witness costs. In order to determine just compensation for these cases, we must retain land appraisers who must separately analyze each parcel of land and provide an opinion of value for the property interest taken. The costs of these appraisals, can, and frequently do, exceed the value of the land being appraised. Thus, we increasingly are being called upon to spend more to defend these cases than we might pay out in just compensation. Nor could this money be saved by settling the cases, as we would still need some sound justification for any settlement amount. As our existing cases progress toward the damages phase, we expect this problem to continue. Therefore, we must make careful use of our resources to avoid exhausting our division's expert witness budget."

[6] Court of Claims forum rates were calculated using current Laffey matrix rates per *Laffey v. Northwest Airlines*, 572 F.Supp. 354 (D.D.C. 1983), *aff'd*, 746 F.2d 4 (D.C.Cir. 1984), *partially rev'd on other grounds by Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (*en banc*), adjusted to current hourly rates based upon the legal services component of the nationwide Consumer Price Index ("the Legal Services Index"), a measure of inflation in the cost of legal services maintained by the Bureau of Labor Statistics. *See, Interfaith Community Organization v. Honeywell International, Inc.*, 426 F.3d 694, 709 n. 11 (3rd Cir. 2005). See also, Affidavit of Mr. Hearne, Exhibit 5, for detail of how this was calculated.

Louis hourly rates proposed by the Justice Department, the hourly Lodestar fee would exceed $1,250,000.[7]

The class members' property was originally taken in 1999. During the more than seven years since the property was taken a number of class members have died and others have sold the property or been divorced. Many class members have called class counsel – some frequently – asking when this case will be resolved and what can be done to achieve a final resolution.

Absent a settlement of the government's liability under URA for paying the statutory attorney fee, this issue would have to have been resolved by litigation before this Court. The time required to litigate the attorney fees together with the additional expense of litigating attorney fees (in both additional interest and yet more attorney fees) would increase the ultimate expense to the federal government without substantially increasing any benefit to the property owners. Further, having to litigate the government's URA attorney fee liability would further delay final resolution of this case and likely delay ultimate payment of compensation to the property owners well into 2007.

With this understanding in mind, counsel for the class and Government entered into settlement discussions concerning the Government's liability to pay attorneys' fees and expenses under the URA. By reason of these settlement discussions, the Plaintiff's counsel and Government settled the Government's URA attorney fee liability with the United States agreeing to pay $740,000.00 toward the class member's attorney fees and $30,000.00 toward the expenses advanced on behalf of the class by class counsel. Class counsel agreed to this settlement on the express condition that, in exchange for settlement of the attorney fees for less than the full lodestar amount and agreeing to the fixed interest amount (as opposed to a continuing per diem

[7] The Government's proposed historic hourly attorney fee rates are specified on Exhibit "3" which is a fax from Mr. Shapiro to Mr. Hearne dated August 7, 2006.

rate), the Justice Department would diligently pursue final approval of this settlement so that the class members would receive their compensation in 2006 and not experience further delay in receiving compensation for the taking of their property. The Government would also, by settling, not have right to appeal what counsel for the class believes to be a favorable resolution of the delay compensation.

This portion of the attorney fees paid by the United States to satisfy its liability under the URA is not the total attorney fee to be paid to class counsel. The total attorney fee provided in the Settlement and in the Notice is one-third of the total award achieved for the benefit of the class which is $2,707,227.58. In the Notice, class counsel notified each class member of the specific portion (in absolute dollars and as a percentage) of their compensation that would be applied to payment of attorney fees. Eighty Two class members expressly consented to this award and Ninety One did not object. Only one class member objected to this payment of attorney fees. The one objecting class member sought an attorney fee that, for his share, would be $6,400 less.

### 5. Every Class Member Has Been Provided Full Details Of The Settlement, Had Opportunity To Fully Consider The Terms Of the Settlement And Eighty One Class Members Have Expressly Consented to This Settlement And Only Two Have Objected

Class counsel has kept all class members informed of the progress of this case and especially kept class members informed of the details of the settlement discussions with the United States as the Settlement was being negotiated and approved by the Government. On September 28, 2006, class counsel advised each class member in writing of the essential terms of the Settlement and invited any comment or questions. Many class members called to discuss the proposed settlement and the details of the proposed settlement as it affected their specific claim. On October 25, 2006, class counsel provided every class member with draft versions of what

class counsel anticipated to be the Settlement Notice documents.[8] These draft Notice documents were identical in every respect (other than the date of the Rule 23(e) hearing and the date on which objections were due) to the Notice actually approved by this Court on November 6, 2006.

On November 6, 2006, this Court approved Notice to the class members advising them of the Rule 23(e) "fairness hearing" and providing them terms of this final settlement and opportunity to object to this Settlement. This Notice was delivered to every class member on November 6th by courier or on November 7th by overnight delivery. Objections were required to be in writing and delivered to class counsel no later than 12:00 Noon on November 13, 2006.

Many class members have discussed details of the Notice and terms of the Settlement with class counsel, others have retained independent legal counsel to advise them on the terms of the Settlement. From the date of the Notice until the deadline for making objection, numerous class members phoned class counsel with specific questions concerning the proposed settlement and seeking additional information.

The terms of this settlement were provided to all class members according to the Notice approved by this Court. Of the Ninety Three eligible class members, only two filed objections to this settlement. Of those two lodging objections to the settlement, one objected to the calculation and payment of the attorneys' fees the other objected to the inclusion of his ex-wife in payment of compensation. We address these two objections below.

## III. One Third of the Common Fund is The Appropriate Measure of Class Counsel's Attorney Fee

The Lathrop & Gage law firm agreed to represent the class on a contingency fee basis in which Lathrop & Gage would receive a fee equal to one-third of the total award received by the

[8] Class counsel provided these draft Notice documents to the class members in response to questions from many class members as well as to provide class members with the greatest possible opportunity to review and consider any potential settlement and raise with class counsel any concerns, questions or other issues that the contemplated settlement presented.

class plus any out-of-pocket expenses incurred by counsel on behalf of the class.[9] If Lathrop & Gage did not receive a successful recovery, they would not be paid and class members had no obligation to pay any attorney fees or expenses incurred in bringing this action on their behalf. The one-third contingency fee is specified in the engagement letter with the lead Plaintiffs as well as in the Entry and in the Notice to class members.

Eighty One class members have expressly consented to payment of the class counsel fee as one-third of the common fund, including the URA attorney fees. Only one class member objected to payment of this attorney fee. The objecting class member, Mr. Reid, did not object to the one-third percentage of fund method of determining the fee. Mr. Reid objected to only the inclusion of the Government's payment of the URA fees in this common fund. Mr. Hearne, as lead class counsel, stated that, were it not for the expectation of receiving an attorney fee of one-third of the common fund, Lathrop & Gage would not have undertaken representation of the class on a contingency basis.

Were it not for class counsel's agreement to represent the class on the basis of this one-third contingency fee agreement, it is unlikely that class members would have (or could have) brought this action for compensation. Absent a contingency fee agreement, each class member would have been required to pay class counsel's hourly fee in full each month and would have paid all costs of bringing this case as well as posting a substantial retainer to initiate the action. This hourly fee would have to have been paid by the class members even if no compensation was recovered.

The common fund upon which the attorney fee is calculated is the aggregate of the principal value of the property, the interest and the Government's URA liability for attorneys'

[9] Class counsel has incurred out-of-pocket expenses of more than $40,000 but is seeking only the $30,000 paid by the Government and is not seeking the more than $10,000 additional out-of-pocket expenses to be paid from class members.

fees. Under the terms of the Settlement this common fund is $8,121,682.73 (not including $30,000 paid by the United States toward reimbursement of expenses advanced by class counsel on behalf of the class) and the one-third attorney fee is $2,707,227.58. Because the Government paid only $30,000 toward expenses and the actual expenses are more than $40,000, the actual attorney fee after these unreimbursed expenses is something less than $2,697,000.

After applying the Government's payment of URA attorney fee, that portion of the remaining attorney fee to be paid from the principal and interest otherwise payable to the class members is $1,967,227.58. After this payment of the attorney fee and expenses, each individual property owner will receive 73.4% percent of their total principal and interest. In other words, while the attorney fee is a total of 33% of the common fund, because class counsel obtained the Government's contribution of its URA liability to the common fund, the attorney fee and expenses represent only 26.6% of the principal and interest.

We explain below why this method of calculating the one-third contingency fee on the total common fund (including that portion of the common fund which represents the Government's URA attorney fee liability) is the appropriate and proper method to determine the attorney fee. The fact that Eighty One class members expressly consented to payment of this fee and only one objected further supports the conclusion that it is fair and appropriate.

### 1. This Court Has Approved An Attorney Fee Of 34% Of The Common Fund (Including The URA Attorney Fee Amount) In A Very Similar Missouri Trails Act Taking Case

In 2005, this Court considered what attorney fee was appropriate in a very similar Missouri Trails Act, class action taking case. The case was *Moore v United States*, 63 Fed Cl. 781 (2005). In *Moore*, this Court noted that "Counsel seeks 40% of approximately $4.7 million, which is characterized as the common fund. Counsel arrived at this figure by subtracting $356,745.33 in expenses from the gross recovery of $5,065,820.62 ($3,981,807 in principal and

interest for the settled claims; $84,013.05 in principal and interest for claims 6, 69, and 107; and $1,000,000 in URA fees and expenses). Counsel's request would result in an award of $1,883,630.12 in attorneys' fees, and $356,745.33 in expenses, leaving $2,825,445.17 for the class." *Moore*, 63 Fed. Cl. at 786. This Court noted that under this 40% of the common fund approach the amount left for the class was only 55.77% of the total recovery. This Court did not grant class counsel in Moore the requested fee of 40% of the common fund but, "conclude[d] that a fee award of $1.6 million is a reasonable recovery for class counsel." *Id.* This Court noted that "[t]his is essentially <u>34% of the total award including statutory fees and is consistent with the standard percentage-of-the-fund approach</u>." *Id.* (emphasis supplied.)

The Settlement in this case specifies that class counsel receive an attorney fee which is 33% of the total award including statutory fees which is one percent of the common fund less than that approved by this Court in *Moore*. In *Moore*, this Court approved an attorney fee equal to 34% of the common fund. In this case the Settlement provides for a fee equal to the slightly less 33% of the common fund. Like this Court found in *Moore*, class counsel believes that this is an attorney fee "consistent with the standard percentage-of-the-fund approach" and is fair and appropriate for the significant work performed (and successes achieved) on behalf of the class members by class counsel.

Specifically, the Settlement provides for class counsel to be paid an attorney fee equal to one-third of the common fund. The common fund upon which this one-third is calculated includes the principal, interest and the amount paid by the government in payment of its URA statutory attorney fee liability. (The common fund does not include any expenses.) The common fund is $8,121,682. One-third of this common fund is $2,707,227. After payment of this fee and all expenses, the amount left for the class is 73.4% of the principle and interest.

### 2. One Third Of The Common Fund Is A Typical Percentage For An Attorney Fee in Common Fund Cases.

One-third of the common fund is typical of the percentage paid class counsel in a case such as this. According to the treatise, *Newberg on Class Actions*, "An attorney whose work creates a common fund is 'entitled to a reasonable fee . . . taken from the fund. *** Usually 50 per cent of the fund is the upper limit on a reasonable fee award from a common fund, in order to assure that fees do not consume a disproportionate part of the recovery obtained for the class, though somewhat larger percentages are not unprecedented. *** Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery." Alba Conte and Herbert B. Newberg, 4 *Newberg on Class Actions* § 14:6 (4th ed.) (citations omitted, emphasis supplied.)

A recent Third Circuit case is also instructive. In *Gunter v. Ridgewood Energy Corporation*, 223 F.3d 190 (3rd Cir, 2000), the class counsel was successful in obtaining a $9.5 Million settlement for the benefit of the class in a RICO claim. "In accordance with their agreement with their clients (the class representatives), and the terms of the class action notice to which no class member objected, plaintiffs' attorneys applied for attorneys' fees, amounting to one-third of the settlement amount, and approximately $300,000 in costs." *Id.* at 191. The district court only allowed fees of 18% of the total settlement amount. The class counsel appealed and the Third Circuit reversed and remanded stating that the district court had not justified its reduction in the fee award from the one-third sought by the class counsel.

*Gunter* also illustrates the fact that a one-third fee is typical in cases such as this. In *Boeing*, discussed more fully below, we note that the U.S. Supreme Court approved a fee of 34.8% in a class action common fund case.

### 3. The Supreme Court Has Held That The Common Fund Upon Which An Attorney Fee Is Calculated Should Include The Full Fund Obtained For The Benefit Of The Class

The United States Supreme Court has affirmed the use of a percentage of the common fund approach as the method to determine the attorney's fee for work on behalf of a class in a situation such as this case. In *Boeing v. Van Gemert,* 444 U.S. 472 (1980) Justice Powell wrote:

> "Since the decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, (1885), this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. See *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); cf. *Hall v. Cole*, 412 U.S. 1, (1973). The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough*, supra 105 U.S., at 532-537, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S., at 257-258 (1975) . The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. See, e. g., *Mills v. Electric Auto-Lite Co*., 396 U.S. 375 at 392 (1970) 444 U.S. at 478."[10]

---

[10] *See also*, Alba Conte and Herbert B. Newberg, 4 *Newberg on Class Actions* § 14:6 (4th ed.). The common fund doctrine allows a court to distribute attorney's fees from the common fund that is created for the satisfaction of class members' claims when a class action reaches settlement or judgment. The doctrine is grounded in the principles of *quantum meruit* and unjust enrichment, in two senses. First, the doctrine prevents unjust enrichment of absent members of the class at the expense of the attorneys. It is meant to compensate the attorneys in proportion to the benefit they have obtained for the entire class (the fund), not just the representative members with whom they have contracted. Second, the doctrine prevents the unjust enrichment of absent class members at the expense of the class representatives. In the absence of the doctrine, only the present members, who hired the attorneys, would have to pay attorney's fees, while all the members, both absent and present, would enjoy the benefits of the settlement or judgment. The members who did not hire the attorneys would be unjustly enriched at the expense of those who did.

Before any potential for a fee from a common fund arises, there must be the creation of such a common fund by efforts of plaintiffs' counsel. Technically, plaintiffs have been successful when creating such a fund. As long as plaintiffs can demonstrate that it was their efforts that resulted in conferring this benefit on the class, they are entitled to a fee from that fund under equitable court powers, regardless of their posture as prevailing parties in whole or in part in the formal litigation or settlement thereof.

4 *Newberg on Class Actions* § 14:6 (4th ed.) (Citations omitted).

Federal courts of appeal (the D.C. Circuit and the 11th Circuit, especially) have shown a distinct preference for the common fund doctrine over the lodestar method of determining an attorney fee for class counsel. See, Swedish Hospital Corp., 1 F.3d at 1272 (stating "we conclude that percentage-of-the-fund is the proper method for calculating fees in a common fund case"); Camden I Condominium Association, Inc. v Dunkle, 946 F.2d 768, 774 (11th Cir. 1991) ("(W)e believe that the percentage of the fund approach is the better reasoned in a common fund case.").

The settlement in this case involves a fund of $8,121,682.73 (the reimbursed portion of $30,000 in expenses are not included in the common fund) that the Government has agreed to pay for the benefit of the participating class members. The fund upon which the percentage fee should be determined is the entire settlement amount. The entire settlement is the measure of the class members' entire monetary benefit, not just the principal and interest that they receive, but also the amount of the settlement paid by the Government to defray attorneys' fees. Counsel's success in obtaining funds for attorney fees has the effect of increasing the percentage of the principal and interest that each class member will receive. Notably, the effect of this arrangement is that (as we noted above) the class will receive 73.4% of the property value and delay damages as opposed to the lower only 66.6% were no URA fees obtained by class counsel.

The total award in *Boeing* was $5,749,006 and the class counsel sought a fee of $2,000,000 to be paid from the total award. The requested attorney fee in *Boeing* was 34.8% of the award. The award, however, included funds for absent class members who may or may not have claimed their share. In the event these absent class members did not claim their share of the fund, the balance was to be paid back to Boeing. "Boeing appealed only one provision of the judgment. It claimed that attorney's fees could not be awarded from the unclaimed portion of the

judgment fund for at least two reasons. First, the equitable doctrine that allows the assessment of attorney's fees against a common fund created by the lawyers' efforts was inapposite because the money in the judgment fund would not benefit those class members who failed to claim it. Second, because Boeing had a colorable claim for the return of the unclaimed money, awarding attorney's fees from those funds might violate the American rule against shifting fees to the losing party. Therefore, Boeing contended, the District Court should award attorney's fees from only the portion of the fund actually claimed by class members." Id. at 477. The Supreme Court rejected this contention and held that counsel for the class should have their fee determined by reference to the entire award not just that portion of the award that was claimed by known class members. In affirming the lower court's decision, the Supreme Court noted that the measure of the benefit to the class was the entirety of the award obtained by class counsel as a benefit to the members of the class. "Since the benefits of the class recovery have been 'traced with some accuracy' and the costs of recovery have been 'shifted with some exactitude to those benefiting,'" the full award was the appropriate measure for determining class counsel's fees. Id. at 480 – 481. (citing, *Alyeska Pipeline Service Co. v. Wilderness Society*, supra, at 265, n. 39,)

### 4. That Portion Of The Recovery That Was Obtained Under Fee-Shifting Statutes Should Be Included In The Common Fund Upon Which The Attorney Fee Is Calculated

The Settlement in this case was reached in light of a potential fee-shifting statute, specifically the URA. The existence of this fee-shifting statute and class counsel's efforts to pursue this claim is why the Settlement included the Government paying a portion of the class members' attorneys' fees. The fact that, in this case, a portion of the common fund was achieved because of a fee-shifting statute is not inconsistent with using the percentage-of-the-common-fund method to establish the fee for class counsel.

The Government's payment toward the class members' attorney fees offsets the class' attorney fee obligation and is part of the class benefit upon which the attorney fee calculation should be based.

As directed by the Supreme Court in *Boeing*, the common fund includes all monetary benefit obtained on behalf of the class. There is no dispute that class counsel's efforts in obtaining the URA a hourly fee from the Government benefited the class. For every dollar class counsel obtained from the Government in statutory attorneys fees, the class benefits proportionally. Simply put, class counsel are asking for a fee equal to one-third of the benefit conferred on the class members through their efforts to recover statutory attorneys fees. This result is consistent with the Supreme Court's analysis in *Boeing*.

Calculating attorneys fees based upon the percentage-of-common fund approach proposed by class counsel achieves a just result. This method provides compensation to class counsel for their efforts to maximize the total recovery. At the same time, each class member's proportional attorney fee obligation is reduced and their net award increased.[11] Including the URA attorney fee payment by the Government in the common fund provides incentive to class counsel to obtain the greatest possible attorney's fee from the Government. If the URA attorney fee portion of the Settlement is not included in the common fund upon which the attorney fee is

---

[11] *See for example*, Martha Pacold, ATTORNEYS' FEES IN CLASS ACTIONS GOVERNED BY FEE-SHIFTING STATUTES, 68 Univ. Chic. L.R. 1007 (2001). In that law review article, the author considered the incentives created in determining an award of attorney fees using percentage-of-the common fund approach in the context of cases with fee-shifting statutes. She concluded that, "the purposes of statutory fee shifting and the common fund doctrine support the idea that fee-shifting provisions should not preempt additional equitable awards. Fee-shifting provisions exist to ensure that attorneys are compensated with at least the lodestar amount, eliminating the bias against taking the cases of poor plaintiffs. *These provisions [fee-shifting statutes] should be taken as setting a minimum fee. Under the common fund doctrine the attorney is additionally entitled to a reward proportionate to the benefit obtained for the class. As a matter of equity, there is no reason why the attorney's fees should be limited to the statutory lodestar minimum if the benefit conferred on the plaintiffs exceeds that minimum*. Overall, establishing a presumption of fee availability under both the statute and the common fund doctrine is probably a better way to equalize settlement and judgment fee potential, and to remove extra incentives to avoid judgment, than is the allowance of risk multipliers. Finally, presuming a full percentage fee in hybrid cases, regardless of whether they are settled or tried, would remove any incentive attorneys may have to discriminate against hybrid cases. *Id* at 1033. (Emphasis supplied).

calculated, there would be no incentive for class counsel to devote any resources for recovering attorney fees from the Government. If class counsel were to be paid one-third of the property value and delay damages alone, all incentive would be to maximize recovery of those amounts alone and to pay little or no regard to obtaining from the Government some payment offsetting the attorney fees.[12]

Including the Government's payment toward attorney fees in the common fund does not raise any concern that class counsel would draw out the litigation in order to drive up the statutory fees because, as is true in all contingent fee cases, the longer a case remains pending and the more work required by counsel, the less profitable the representation. Including the recovery of statutory fees in the common fund more fully aligns class counsel's financial interest with the class members' financial interest.

As previously noted, when class members are credited the amount of their fees paid by the federal government, class members are paying attorney fees representing only 26.6% of the property value and delay damages. To exclude the amount that class counsel obtained toward payment of the class member's attorney fee would be to short change class counsel for their substantial efforts on behalf of the class.

### 5. The Lodestar Amount Does Not Fairly Compensate Class Counsel.

(a) As a matter of fact the Lodestar amount does not fairly compensate class counsel.

As a matter of fact, the lodestar calculation of a fee does not fairly and adequately compensate class counsel for their work on behalf of the class. The lead class counsel, Mr.

[12] Counsel for the class have endeavored to act (and believe they have in fact acted) in all respects in full regard to their ethical obligation to advance their client's best interest, whether or not doing so advances the class counsel's own financial interest. In making this point that including the attorney fee portion of the Settlement in the common fund aligns the financial incentive of the attorney and the client, class counsel is doing so to make the point that this is consistent with the policy underlying contingent fee and common fund attorney fee arrangements.

Hearne, provides his affidavit in support of the Settlement. In that affidavit Mr. Hearne notes the following: (1) The class member's law firm, Lathrop & Gage, would not have undertaken this representation on a contingency basis without expectation that they would receive one-third of the common fund if successful. (2) Were Lathrop & Gage to have taken this case on the basis of an hourly rate billing arrangement, Lathrop & Gage would have required that: (i) the legal fee and any advanced expenses be billed and paid each month, (ii) that the hourly billing rates would be those specified in Mr. Hearne's affidavit which range from $133 to $587, per hour, depending upon the specific professional involved, (iii) that the class members' post a substantial retainer sufficient to cover, at minimum, several months of anticipated legal fees and expenses; and, (iv) the legal fees would be paid even if no recovery was obtained. (3) Lathrop & Gage, through the experience of Mr. Hearne and other members of the firm, possess significant and unique expertise in Trails Act litigation that is not shared by other law firms. By virtue of this experience, Lathrop & Gage is able to more effectively (and more successfully) represent property owners in Trails Act taking cases, especially those involving Missouri law. (4) Other law firms with a practice in Washington, D.C. and St. Louis would require a comparable contingency fee agreement (most requiring a percentage of the common fund greater than one-third such as the firm in *Moore* that sought a 40% fee) or a comparable hourly billing agreement to undertake this case. (5) That were the only compensation Lathrop & Gage received for their representation of the class the lodestar amount –they would not have agreed to represent the class unless this amount was paid monthly and a substantial retainer was paid as specified above. In other words, Lathrop & Gage would not have agreed to represent the class for the lodestar fee paid only upon the successful conclusion of the case. (6) Bringing this case on behalf of the class members required Lathrop & Gage to invest substantial firm resources, including

significant salary of the professionals and staff involved in working on this case. (7) The total hours spent by Lathrop & Gage professionals on behalf of the class members exceeds 4,800 (The specific hours devoted to this case by each professional are detailed in Mr. Hearne's affidavit). (8) Lathrop & Gage – especially in light of the experience in the *Illig v. United States* case, considers Trails Act taking litigation to carry a substantial risk. (9) That all time spent by Lathrop & Gage professionals on behalf of the class members was time that was not spent on behalf of other firm clients. The vast majority of other Lathrop & Gage firm clients pay Lathrop & Gage current hourly rates for their representation or pay a monthly retainer in which Lathrop & Gage was assured of receiving payment for their services. (10) That the total hourly rate attorney fee (using the current lodestar rates that Lathrop & Gage would have charged) is more than $1,900,000 for that time spent by Lathrop & Gage through October 2006. (11) That Lathrop & Gage has advanced more than $40,000 in out-of-pocket expenses on behalf of the class. (12) That even were they now to receive this lodestar fee and all out of pocket expenses, Lathrop & Gage would not consider this to be adequate compensation because this delayed payment does not reimburse Lathrop & Gage for the substantial risk of non-payment nor the cost of prosecuting this case for more than four years without any payment.

All of the forgoing reasons set forth in Mr. Hearne's affidavit demonstrate that, as a matter of fact, the lodestar fee is not fair or adequate compensation for class counsel's representation of the class and, apart from the one-third contingency agreement, class counsel would not have undertaken this representation.

(b) As a matter of law, the percentage of common fund is the better measure of an attorney fee for class counsel in a case such as this one and Court's are critical of Lodestar fees in a case such as this.

Courts are increasingly critical of the lodestar method of determining fees in class action cases. The "lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result." *Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 437 (D. Md. 1998). The trend toward the percentage of the fund method continues, or really, accelerates. See, e.g., *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir. 2005) (method aligns interests of class and counsel); In re *Sumitomo Copper Litigation*, 74 F. Supp. 2d. 393 (S.D.N.Y. 1999)(Pollack, J.) (describing "ground swell of support" for percentage-of-the-fund approach and reviewing case law in 8 circuits); *Ramah Navajo Chapter v. Babbitt*, 50 F.Supp.2d 1091 (D.N.M. 1999); In re *Nasdaq Market-Makers Antitrust Litigation*, 187 F.R.D. 465 (S.D.N.Y. 1998). In *Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942, 944 (E.D. Tex. 2000), the court recognized consistent support for the percentage-of-recovery method for determing attorney fees in common fund cases.

**A. Lodestar Does Not Compensate Counsel For The Delay in Payment.**

Counsel for the class began work on this case in late 2001. Time spent by counsel on behalf of the class was not spent on matters for other clients who would be billed and pay counsel's fee in the customary thirty-day business cycle. “When plaintiffs' entitlement to attorney's fees depends on success, their lawyers are not paid until a favorable decision finally eventuates, which may be years later, as in this case. Meanwhile, their expenses of doing business continue and must be met. In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. See, e.g., *Sierra Club v. EPA,* 248 U.S.App.D.C. 107, 120-121, 769 F.2d 796, 809-810 (1985); *Louisville Black Police Officers Organization, Inc. v. Louisville*, 700 F.2d 268, 276, 281 (6th Cir. 1983). Although delay and the risk of nonpayment are often mentioned in the same breath, adjusting for the former is a distinct

issue that is not involved in this case." *Pennsylvania, v. Delaware Valley Citizens' Council For Clean Air*, 483 U.S. 711, 716 (1987)

Were the opponent any party other than the United States Government, the lodestar would have been adjusted for both interest on advanced costs (see below) and the delay factor discussed by the Supreme Court would have been addressed by having fees calculated at current instead of historic rates. See, 10 Moore's Federal Practice § 54.190[3][e] (Matthew Bender 3d Ed., 2002) (noting general approval of a delay adjustment, but observing that "[i]f the opponent is the United States, sovereign immunity prevents the implementation of any delay enhancement."); Cited with approval by *Applegate v. United States*, 52 Fed.Cl. 751 (2002) at 770. Failure of the Plaintiff to add an additional amount to the lodestar because the defendant is the United States does not mean that it is fair compensation for class counsel's work on behalf of the class.

**B. The Lodestar Fee Does Not Compensate Class Counsel for the Substantial Risk of Non-Payment.**

"When the plaintiff has agreed to pay its attorney, win or lose, the attorney has not assumed the risk of nonpayment and there is no occasion to adjust the lodestar fee because the case was a risky one." In *Jones v. Central Soya Co*., 748 F.2d 586, 593 (11th Cir. 1984), where the court said that "[a] lawyer may not preserve a right of recourse against his client for fees and still expect to be compensated as if he had sacrificed completely his right to payment in the event of an unsuccessful outcome." Delaware Valley, 483 U.S. at 716. Similarly, the third circuit observed in *Lindy Bros. Builders, Inc v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd, 1973), "[n]o one expects a lawyer to give his services at bargain rates in a civil matter on behalf of a client who is not impecunious. No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would

charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended." Id. quoting, *Cherner v. Transitron Electronics Corp.*, 221 F. Supp. 55, 61 (D. Mass. 1963).

## IV. Response to Class Members' Objections to Damage Awards

The proponents of a class settlement bear the burden of showing that it is "fair, reasonable, and adequate." *Moore v. United States*, 63 Fed. Cl. 781, 783 (2005) Nonetheless, 'the fact that a proposed settlement has already received the preliminary approval [from plaintiff's counsel] counsel's strongly in favor of approving the settlement even over any objections that may be lodged against it." Id at 784, quoting *National Treasury Employees Union v. United States*, 54 Fed. Cl. 791, 797-98 (2002). Moreover, "with such approval a decree is presumptively reasonable. An individual who objects, consequently, has a bearing burden of demonstrating that the decree is unreasonable." Id.

Class counsel belive that the Settlement is one that is fair, reasonable and adequate. This Settlement was achieved as the result of substantial effort on behalf of the class and is one that provides each class member a fair but significant financial benefit.

### 1. Jim Reid: The Single Class Member to object To Calculation Of Attorneys' Fees

When the Notice documents were sent to class members Eighty Two responded with affirmative approval of the settlement and calculation of the proposed attorney fee. A number called class counsel to commend class counsel for their work and noted expressly that they believe the attorney fee is fair and appropriate. Only one class member raised any objection to the calculation of the attorney fee. That one class member is Jim Reid. Mr. Reid seeks a method

of calculating the attorney fee that will increase his compensation by $6,400 and begrudge class counsel a like amount.

Before addressing Mr. Reid's objections, it is important to note what he does **not** object to. Mr. Reid does not object to the use of the "percentage-of-the-common-fund" approach to determining class counsel's fee or to the use of a one-third percentage. Nor does Mr. Reid object to the class paying the entirety of the counsel's expenses, both those reimbursed by the government and those not reimbursed by the government. Mr. Reid does not object to a fee calculated as one third of the principal and interest recovered.

Mr. Reid initially called class counsel representing that he was speaking as a representative for several of the class members receiving the largest amount of compensation including the City of Crestwood, Lindbergh School District, Van Hoffman Press and others. Mr. Reid represented that he wanted to "negotiate" the attorney fee on behalf of this group of class members. Mr. Reid specifically stated that he did not object to calculating the attorney fee as one-third of the common fund but that he objected to including the Government's payment of the URA amount in the common fund. Mr. Reid indicated that he wanted to "help class counsel resolve these objections" by negotiating on behalf of this group of class members. Class counsel indicated that Mr. Reid was free to file an objection, encouraged him to do so and recommended that he obtain independent counsel to advise him in this regard. Class counsel indicated that they could not negotiate a separate attorney fee agreement with only one class member or one group of class members.

Subsequently, class counsel learned that the class members named by Mr. Reid as ones for whom he spoke, not only have not lodged any objection to the attorney fee calculation, they have each affirmatively consented to the Settlement and the calculation of attorney fee provided

in the Settlement. Some of these class members consulted separate counsel for advice before consenting. Further, several of these class members called class counsel and expressly stated that Mr. Reid did not speak for them and they disavowed any involvement in Mr. Reid's efforts to independently negotiate attorney fees. Another class member called class counsel to inform them that Mr. Reid was calling class members in an effort to create a group objecting to the attorney fee. One class member said that Mr. Reid told him that, "no one was joining him and he "needed to get some other objections" so they could negotiate the attorney fee. (See Affidavit of Mr. Hearne, Exhibit 5)

Mr. Reid is fee owner of property referenced in claims number 13, 14, and 15. The settlement provides that Mr. Reid will receive property compensation of $122,851.00 (the amount determined by the common appraiser) and delay damages of $70,455.32. Additionally, Mr. Reid's pro rata share of the URA portion of attorney fees paid by the United States is $19,378.38. Mr. Reid has directly benefited in that amount solely through class counsel's efforts in obtaining those URA fees. In sum, Mr. Reid will receive a total award of $212,684.70 and a net award (after deduction of attorney fees) of $141,789.94. This is the same 66.6% percentage of the total compensation ($212,684.70) and the 73.4% of the principal and interest ($193,306.32) received by all other class members under the terms of the Settlement.

The Government owes Mr. Reid total compensation of $193,306.32 for principal damages and interest. This is reduced by at total of $51,516 in attorney fees, almost $20,000 of which the Government will pay. Mr. Reid has never paid a dime toward the attorney fees and costs incurred in bringing this action nor was he obligated to do so unless the class counsel was successful in obtaining a recovery on his behalf. And, even then, the amount Mr. Reid was required to pay was limited to not more than one-third of the total recovery.

Had Mr. Reid brought this case on his own behalf without the benefit of a contingency fee agreement the cost to obtain a successful recovery would have greatly exceeded the $51,516 amount by which his compensation is being reduced to pay class counsel and likely would have exceeded the entire compensation that he received.

There is no question that, had Mr. Reid pursued his claim independent of this class action he would have been required to pay an attorney fee far greater than $51,500. Nonetheless, he argues that the attorney fee is excessive and seeks an arrangement whereby he would receive a total benefit of $212,684.70 and pay a fee to counsel of only $64.371.00.

Counsel for the class does not believe that the fee structure proposed by Mr. Reid is fair nor does it provide appropriate compensation to class counsel. Mr. Reid's objection should be rejected for the following reasons: (1) Defining the common fund as only the principle and interest and not including the attorney fees is contrary to the established "percentage-of-the-common-fund" approach and would provide Mr. Reid a windfall. (2) Mr. Reid's proposed fee structure is contrary to the agreed contingency fee under which class counsel accepted the class representation and which all other class members have agreed to.

The common fund method of determining the class counsel fee, a method that Mr. Reid agrees is the appropriate method of determining the fee, is directed to determine the fee as a percentage of the benefit conferred on the plaintiffs. See, *Boeing*, Supra. In this case, the Government's agreement to make payment of URA attorney fee in addition to the principle and interest is intended to benefit the class members. The common fund method of determining a fee provides that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from <u>the fund as a whole</u>." *Boeing* at 478 (emphasis supplied).

The attorney fees paid by the Government toward its URA liability are not for the benefit of counsel but are a benefit that counsel obtained for the class. Because of counsel's efforts on behalf of the class the payment of funds to offset attorney fees mean that less of the principle and interest is used to pay for the class's legal representation. Mr. Reid states that he has no objection to applying 33% of the principal and interest to counsel's fee but than takes with the left hand what he purport to give with the right by applying the settlement funds to offset this percentage. He can not have it both ways. If the settlement funds designated as applying to class counsel's fees are not a benefit for the class upon which the percentage of the common fund should apply, than the fee should be paid directly to class counsel in addition to the 33 percent of the principle and interest settlement obtained for the class.

**2. Warren Peterson: Claim #5**

Mr. Warren Peterson filed an "objection" that consisted of several questions. He does not object to the property value, interest, or attorney fees amounts provided in the Settlement and Notice. Mr. Peterson raises four procedural questions that are not the proper subject of a Rule 23(e) fairness hearing.

Mr. Peterson's principal objection with the settlement is that payment of compensation would be made to both Mr. Peterson and his ex-wife, Gretchen Peterson. Mr. Peterson was married on the date of the taking and his wife's name was on the deed. Therefore, she was owner of an undivided one-half interest in the property on August 18, 1999. The Peterson's are now divorced. Mr. Peterson has advised class counsel that he does not want to share the proceeds with his ex-wife and does not want any check made out jointly. (See, Affidavit of Bob Sears, Exhibit 4)

Counsel for the class have advised Mr. Peterson that this is an issue for the Missouri Family Court judge and this Court is not the forum to decide the issue. The timing of the taking

under Missouri law and federal law have been extensively examined by this Court and determined to be August 18, 1999. Therefore, Mr. Peterson's first question is not a proper basis for a Rule 23(e) objection.

Mr. Peterson's second question is whether a person, to qualify for payment, must both opt-in by filing an entry of appearance and be the owner of fee title to the property taken on the date of taking. Again, this relates to the issue of sharing the proceeds with his ex-wife. Mr. Peterson opted-in for the proceeds but wants the total amount paid solely to him because he did not include his ex-wife's name on the entry. However, at the time of the entry, he was still married and the property was jointly owned so the entry was on behalf of both he and Mrs. Peterson. The Peterson's subsequent divorce does not change the fact that the funds are to be paid to those who owned the property on the date of taking.

Mr. Peterson's third question relates to the "future of Grant Trail corridor subject to US Surface Transportation Board." Again, this query is beyond the scope of a Rule 23(e) hearing. The future of the trail and the STB's authority are not an issue determined by any order of this court nor by the Settlement between the parties and is not an objection relevant to a Rule 23(e) hearing.

His fourth question is that "US has not taken a position on class counsels' entitlement to attorneys' fees respectively." Whether or not the United States takes a position as to fees, is not a basis for objection. The Settlement states merely that the United States is neutral on that issue of the class counsel's fee. We discuss above why the attorney fee paid to class counsel is fair and appropriate.

Finally, Mr. Peterson requests additional time to respond. Mr. Peterson has had more contact with class than the vast majority of other class members. All discussions have concerned

his desire to avoid sharing of the proceeds with his ex-wife.[13] Class counsel, Mr. J. Robert Sears, has engaged in discussions with Mr. Peterson on these issues for more than five months. Mr. Peterson asked whether he had to share with his ex-wife and was advised that any proceeds would be distributed by check made out to him and his ex-wife. He was further advised by Mr. Sears that he should consult his divorce attorney about how the property should be divided under any separation decree issued by the Missouri Family Court but that since his wife was an owner on the date of taking, her name would be included on the check. Mr. Sears offered to talk with or meet with his divorce attorney to answer any questions she may have. In fact, Mr. Peterson arranged for a meeting with his divorce attorney, Mr. Sears and Mr. Hearne to take place in the offices of Lathrop & Gage L.C.. Mr. Peterson later canceled this meeting.

Mr. Peterson's complaint that he has not had sufficient time fails to take into account that: 1) he has discussed this very issue with class counsel and his divorce attorney for many months; 2) Mr. Peterson, along with all class members, received draft copies of the Notice on October 25, 2006, which Notice advised him that his ex-wife was a payee; 3) As early as September 29, 2006, class counsel sent correspondence to Mr. Peterson (and all class members) including, among other information, the parties who were on the title on the date of taking and entitled to payment; 4) On October 27, 2006, Mr. Peterson and Mr. Sears had another full discussion about inclusion of his ex-wife on the check and his wish not to share the proceeds with his ex-wife, that conversation was followed by one with Mr. Hearne; 5) Mr. Peterson received the official Notice approved by this Court on November 7, 2006 clearly noting the deadline for objection, also approved by the Court, of November 13, 2006, not the 5 day notice

[13] For this section, see Affidavit of J. Robert Sears, Exhibit 4

Mr. Peterson notes in his letter, and, finally; 6) No other party has objected to the time of notice and Eighty Two other class members were able to respond in the Court-approved time frame.

In sum, Mr. Peterson objects to sharing the proceeds with his ex-wife and allowing Mr. Peterson additional time will not in any way change this issue.

**Conclusion**

For the reasons stated in this memorandum, the Settlement and Class Counsel's fees should be approved by this Court as they are fair and just to all Plaintiff Class Members and to the United States.

Respectfully submitted,

LATHROP & GAGE, L.C.

/s/ Mark F. Hearne, II

Mark F. Hearne, II
J. Robert Sears
10 S. Broadway, Suite 1300
St. Louis, MO 63102-1708
TEL (314) 613-2500
FAX (314) 613-2550

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 13th day of November, 2006, a true and accurate copy of the foregoing document was served upon, William J. Shapiro, william.shapiro@usdoj.gov, via the Court's electronic filing system.

/s./ J. Robert Sears