**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| DIANE J. MILLER, et.al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03-24891 |
| | ) | |
| v. | ) | Senior Judge Bruggink |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PROPOSED SETTLEMENT**

COME NOW Plaintiffs and Defendant, by and through their attorneys of record, and hereby agree as follows:

1. Class Counsel and Defendant have engaged in good faith efforts to avoid the need for further litigation as to the value of that property at issue in this case pending in the Court of Federal Claims.

2. This Proposed Settlement applies to all claims involved in this opt-in class action. These claims are listed in Exhibit 1.

3. On August 18, 1999, those Class Members identified in Exhibit 1 ("the Class Members") were the fee owners of certain parcels of real property located in St. Louis County Missouri. These properties are described in more detail in each Class Member's Entry of Appearance, which documents were filed in this Court during the course of the above-captioned lawsuit.

4. Before August 18, 1999, the Union Pacific Railroad Company ("Union Pacific") owned and used a railroad corridor located in St. Louis County, extending from Mile Post 13.766

and Mile Post 15.8, and is further described in Exhibit A to the Donation and Purchase and Sale Agreement between Union Pacific and Trailnet, Inc., (the "Trail Use Agreement") which is attached as Exhibit 2 to this Proposed Settlement. This railroad corridor is hereinafter termed the "Railroad Line."

5. Before August 18, 1999, the Railroad Line extended over a portion of each Class Member's property.

6. On August 18, 1999, the Surface Transportation Board ("STB") issued a Decision and Notice of interim Trail Use or Abandonment or Abandonment ("NITU") in STB Docket No. AB-33 (Sub-No. 135X), pursuant to the authority granted by 16 U.S.C. §1247(d) (the "Trails Act"), and other federal laws. A copy of the NITU is attached as Exhibit 3.

7. As a result of the STB's issuance of a NITU and the subsequent Trail Use Agreement, the Class Members' Properties were made subject to an easement for current recreational trail use and future reactivation as a railroad corridor pursuant to the Trails Act. This easement is hereinafter termed "Trails Act Easement," and is more particularly described in paragraph 8-13 below.

8. The length of the Trails Act Easement over each of the Class Members' Properties is the same lineal length (a.k.a. "frontage") and width as the original railroad easement, which Union Pacific purported to convey to Trailnet, Inc. on July 26, 2001.

9. The location of the Trails Act Easement over each of the Class Members' Properties is the same location as the railroad easement, which Union Pacific purported to convey to Trailnet, Inc. on July 26, 2001.

10. The Trails Act Easement is subject to restoration and/or reconstruction of the railroad right-of-way and may be used for interim trail use purposes, in a manner consistent with the terms and conditions of the Act.

11. The Trails Act Easement is binding upon the Class Members, their heirs, assigns, and grantees.

12. The parties agree and stipulate that the Class Members have the right to use the Trails Act Easement in any manner consistent with applicable Missouri state law. The qualified trail operator, not the United States, has exclusive management and control of the Trails Act Easement, and the United States makes no guarantees, promises, or representations as to the qualified trail operator's willingness to allow the Class Members to use the easement area for any purpose.

13. Defendant hereby agrees to pay the Class Members just compensation in the following amounts: $4,691,244 as the aggregate fair market value of that property taken from the Class Members resulting from the imposition of the Trails Act Easement and a schedule of the fair market value of each individual Class member is specified on the attached Exhibit 1; $2,690,438.73 for all delay damages incurred since August 18, 1999; $740,000.00 in attorneys fees and $30,000.00 for costs. The Defendant's total payment of compensation to the Class Members herein shall be $8,151,682.73. Upon receipt of said payment, Class Members waive any additional compensation for Fifth Amendment takings claims or any claims for fees, costs, or other litigation expenses related to the issuance of the NITU on August 18, 1999.

14. Payment of the above amount shall constitute a full, complete and final resolution

of all claims and defenses, legal or equitable, arising out of this lawsuit and any defenses thereto.

15. This Proposed Settlement is the result of compromise and settlement, and shall not be construed as an admission by Defendant of any legal or specific monetary liability as to any or all of the Class Members' claims for just compensation, interest, costs, or other litigation expenses, or other kind of monetary relief or compensation, nor shall the settlement be interpreted to constitute a precedent or argument in this or any other case.

Respectfully submitted this 15th day of November 2006.

MARK F. HEARNE, II
J. ROBERT SEARS
Lathrop and Gage
2000 Equitable Building
10 South Broadway
St. Louis, MO 63102-1774
(314) 613-2500 (Phone)
(314) 613-2550 (Fax)

ATTORNEYS FOR CLASS

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
U.S. Department of Justice

WILLIAM J. SHAPIRO
Environment & Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814
(916) 930-2207 (Phone)
(916) 930-2210 (Fax)

ATTORNEY FOR DEFENDANT

| Claim No. | Legal Title | Address | Property Address | Principle | Interest | Total Compensation |
|---|---|---|---|---|---|---|
| 1 | Timothy G. Immer | Timothy Immer<br>11101 Patrina Court<br>St. Louis, MO 63126 | 801 S. Holmes | 47,400.00 | 27,184.00 | 74,584.00 |
| 5 | Warren J & Gretchen Peterson | Warren Peterson<br>18 Dardenne Woods Ct.<br>St. Louis, MO 63366 | 9860/9870 Big Bend | 219,150.00 | 125,683.01 | 344,833.01 |
| 9 | Joan C. Petropolous | Joan C. Petropolous<br>177 Chatwood Terrace<br>Crestwood, MO 63126 | 177 Chatwood Terrace | 16,265.00 | 9,328.01 | 25,593.01 |
| 12 | Therese S. Minda | Therese S. Minda<br>13020 Marcella Blvd.<br>Loxahatchee, FL 33470 | 845 S. Sappington Rd. | 250,425.00 | 143,619.29 | 394,044.29 |
| 13 | James Reid (25%) Joan Milburn (25%) Reid Trust II (25%) Milburn Trust (25%) | James Reid<br>P.O Box 190<br>O'Fallon, MO 63366 | 1110 Reco | 42,738.00 | 24,510.34 | 67,248.34 |
| 14 | James Reid | James Reid<br>306 McDonough<br>St. Charles, MO 63301 | 1132 Reco | 28,113.00 | 16,122.87 | 44,235.87 |
| 15 | James Reid (1/8), Joan Milburn (1/7), Reid Trust II (2/7), Milburn Trust (3/7) | James Reid<br>P.O Box 190<br>O'Fallon, MO 63366 | 1154 Reco | 52,000.00 | 29,822.11 | 81,822.11 |
| 17 | City of Crestwood | James A. Eckrich<br>City of Crestwood<br>1 Detjen Dr.<br>Crestwood, MO 63126 | 1015 Sappington | 118,800.00 | 68,132.06 | 186,932.06 |
| 18 | Brian & Norma Andris | Brian & Norma Andris<br>973 Westglen Dr.<br>Crestwood, MO 63126 | 973 Westglen Dr. | 21,400.00 | 12,272.95 | 33,672.95 |
| 19 | Donald & Betty Eschelbach | Donald & Betty Eschelbach<br>1011 Westglen Dr.<br>Crestwood, MO 63126 | 1011 Westglen Dr. | 14,000.00 | 8,029.03 | 22,029.03 |

EXHIBIT 1

STLDOCS 193020v1

| | | | | | | |
|---|---|---|---|---|---|---|
| 20 | Sharon Frederickson | Sharon Frederickson<br>1017 Westglen Dr.<br>Crestwood, MO 63126 | 1017 Westglen Dr. | 14,000.00 | 8,029.03 | 22,029.03 |
| 21 | Eric R. Robertson & Shelly N. Boatwright | Eric R Robertson<br>1023 Westglen Dr.<br>Crestwood, MO 63126 | 1023 Westglen Dr. | 14,000.00 | 8,029.03 | 22,029.03 |
| 22 | Betty J. Baumann | Betty J. Baumann<br>1029 Westglen Dr.<br>Crestwood, MO 63126 | 1029 Westglen Dr. | 14,200.00 | 8,143.73 | 22,434.73 |
| 23 | Wilton & Mark K. Kottkamp | Wilton & Mary K. Kottkamp<br>1035 Westglen Dr.<br>Crestwood, MO 63126 | 1035 Westglen Dr. | 14,000.00 | 8,029.03 | 22,029.03 |
| 25 | Charlotte & Tamara Tatosian | Charlotte & Tamara Tatosian<br>1047 Westglen Dr.<br>Crestwood, MO 63126 | 1047 Westglen Dr. | 13,600.00 | 7,799.63 | 21,399.63 |
| 26 | Muriel J. Marks | Muriel J. Marks<br>11038 Gravois Rd.<br>St. Louis, MO 63126 | 1053 Westglen Dr. | 14,400.00 | 8,258.43 | 22,658.43 |
| 27 | John & Louise Schoelch | John & Louise Schoelch<br>1059 Westglen Dr.<br>Crestwood, MO 63126 | 1059 Westglen Dr. | 14,000.00 | 8,029.03 | 22,029.03 |
| 28 | MATCO Machine & Tool | Terry A. Machalek<br>MATCO Machine & Tool<br>652 Greensleeves<br>Fenton, MO 63026 | 9530 Watson Ind. Park | 4,200.00 | 2,408.71 | 6,608.71 |
| 29 | Jeanne Oberle | Jeanne Oberle<br>856 Woodbine Dr.<br>Crestwood, MO 63126 | 856 Woodbine Dr. | 16,490.00 | 9,457.05 | 25,947.05 |
| 30 | Von Weiss Properties, LLC | Gage Von Weise, Jr.<br>370 Gray Ave.<br>Webster Groves, MO 63119 | 9531 Watson Ind. Park | 51,261.00 | 29,398.30 | 80,659.30 |
| 34 | Josephine Nicoletti | Josephine Nicoletti<br>7410 Cheshire Lane<br>Crestwood, MO 63123 | 9519, 9523 & 9527 Watson Ind. Park | 16,200.00 | 9,290.74 | 25,490.74 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 35 | Rothkopf Investment Properties | John Rothkopf<br>9511 Watson Industrial Park<br>Crestwood, MO 63126 | 9511 Watson Ind. Park | 14,250.00 | 8,172.41 | 22,422.41 |
| 36 | Angela & David Brumfield | David & Angela Brumfield<br>8884 Rusdon<br>Crestwood, MO 63126 | 1321 Trelane Ave. | 17,000.00 | 9,749.54 | 26,749.54 |
| 37 | William & Rozanne Grossenheider | William & Rozanne Grossenheider<br>1333 Trelane Ave.<br>Crestwood, MO 63126 | 1333 Trelane Ave | 13,000.00 | 7,455.53 | 20,455.53 |
| 38 | Gary & Glenda Gauss | Gary & Glenda Gauss<br>1337 Trelane Ave.<br>St. Louis, MO 63126 | 1337 Trelane Ave. | 13,000.00 | 7,455.53 | 20,455.53 |
| 39 | Donald & Ada Clark | Donald & Ada Clark<br>1341 Trelane Ave.<br>Crestwood, MO 63126 | 1341 Trelane Ave. | 13,800.00 | 7,914.33 | 21,714.33 |
| 40 | Elroy & Sandra Munce | Elroy & Sandra Munce<br>12091 Rosemist Dr.<br>St. Louis, MO 63138 | 9390/9401 Watson Ind. Park | 60,000.00 | 34,410.13 | 94,410.13 |
| 41 | David Finley & Laura Wicker-Finley | David Finley & Laura Wicker-Finley<br>1347 Trelane Ave.<br>St. Louis, MO 63126 | 1347 Trelane Ave. | 13,000.00 | 7,455.53 | 20,455.53 |
| 42 | Lillian M. Johnson | Lillian M. Johnson<br>10571 Carroll Wood Way<br>St. Louis, MO 63128 | 1351 Trelane Ave. | 14,800.00 | 8,487.83 | 23,287.83 |
| 44 | Judith Dressel | Judith Dressel<br>9088 Fernald Drive<br>St. Louis, MO 63123 | 1405 Trelane Ave. | 14,000.00 | 8,029.03 | 22,029.03 |
| 45 | RNC Enterprises, Inc. | Ronald Carter<br>RNC Enterprises, Inc.<br>2513 Town & Country Lane<br>St. Louis, MO 63131 | 9353/9375 Watson Ind. Park | 61,650.00 | 35,356.41 | 97,006.41 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 46 | Timothy & Diane Wicker | Timothy & Diane Wicker<br>1423 Trelane Ave.<br>Crestwood, MO 63126 | 1423 Trelane Ave. | 14,000.00 | 8,029.03 | 22,029.03 |
| 47 | Rolland & Louise Dodson | Rolland & Louise Dodson<br>1435 Trelane Ave.<br>Crestwood, MO 63126 | 1435 Trelane Ave. | 14,000.00 | 8,029.03 | 22,029.03 |
| 48 | James J. Barry, Trustee of Trust One Under the Indenture of Trust of Joseph K. Barry | James J. Barry<br>Mid States Paint<br>9315 Watson Industrial Park<br>Crestwood, MO 63126 | 9315 Watson Ind. Park | 28,200.00 | 16,172.76 | 44,372.76 |
| 50 | Mary Ann Callahan | Mary Ann Callahan<br>1525 Cardinal Lane<br>Mount Juliet, TN 37122 | 1459 Trelane Ave. | 28,000.00 | 16,058.06 | 44,058.06 |
| 52 | Katherine Cowles | Kay M. Cowles<br>1463 Trelane Ave.<br>Crestwood, MO 63126 | 1463 Trelane Ave. | 27,400.00 | 15,713.96 | 43,113.96 |
| 53 | Robert N. Miller, M.D. & Diane Miller | Dr. Robert and Dianne Miller<br>551 High Meadow Rd.<br>St. Louis, MO 63131 | 9221 Watson Ind. Park | 22,800.00 | 13,075.85 | 35,875.85 |
| 54 | City of Crestwood | James A. Eckrich<br>City of Crestwood<br>1 Detjen Dr.<br>Crestwood, MO 63126 | 1510 Shoppers Lane | 4,860.00 | 2,787.22 | 7,647.22 |
| 55 | Crestwood Square Associates, L.P. | Bill Appelbaum<br>Crestwood Square Associates, L.P.<br>9109 Watson Rd., Suite 400<br>Crestwood, MO 63126 | 9031 Watson Rd. | 482,451.00 | 276,686.71 | 759,137.71 |
| 56 | Betty L. Haley | Betty L. Haley<br>1601 Ridgewood<br>Crestwood, MO 63126 | 1601 Ridgewood | 22,000.00 | 12,617.05 | 34,617.05 |
| 57 | Michael & Penny Rauls | Penny Rauls<br>1605 Ridgewood<br>Crestwood, MO 63126 | 1605 Ridgewood | 16,000.00 | 9,176.04 | 25,176.04 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 58 | Shirley M. Joerger | Shirley M. Joerger<br>1619 Ridgewood<br>Crestwood, MO 63126 | 1619 Ridgewood | 13,000.00 | 7,455.53 | 20,455.53 |
| 59 | Barbara & David Beal | Barbara & David Beal<br>132 N. Meridian Rd.<br>Glen Carbon, IL 62034 | 1625 Ridgewood | 12,200.00 | 6,996.73 | 19,196.73 |
| 60 | Claude, Jr.& Juanita Pope | Claude, Jr. & Juanita Pope<br>1631 Ridgewood Drive<br>Crestwood, MO 63126 | 1631 Ridgewood | 12,400.00 | 7,111.43 | 19,511.43 |
| 61 | Robert Shea, Jr. | Robert Shea, Jr.<br>1707 Ridgewood<br>Crestwood, MO 63126 | 1707 Ridgewood | 12,400.00 | 7,111.43 | 19,511.43 |
| 62 | Mildred I. Christy | Mildred I. Christy<br>1717 Ridgewood Drive<br>Crestwood, MO 63126 | 1717 Ridgewood | 13,028.00 | 7,471.59 | 20,499.59 |
| 63 | Lola Nancy Vos & Donna Mortenson | Lola Nancy Vos & Donna Mortensen<br>1729 Ridgewood<br>St. Louis, MO 63126 | 1729 Ridegwood | 14,600.00 | 8,373.13 | 22,973.13 |
| 64 | Tallman-Pardee, LLC | R.B. Tallman, Jr.<br>Tallman-Pardee, LLC<br>8642 Pardee Lane<br>Crestwood, MO 63126 | 8461 Pardee | 200,750.00 | 115,130.57 | 315,880.57 |
| 65 | The EOM Company | Emmett Mehaffy<br>The EOM Company<br>975 Woodbine Dr.<br>St. Louis, MO 63126 | 8661 Grant Rd. | 29,468.00 | 16,899.96 | 46,367.96 |
| 66 | Robert & Carol Stelmach | Robert and Carol Stelmach<br>33 Grantwood Lane<br>Crestwood, MO 63126 | 9000 Watson Rd. | 167,200.00 | 95,889.57 | 263,089.57 |
| 67 | Thomas J & Toni Batsch | Thomas J. & Toni Batsch<br>8710 Pardee Lane<br>Crestwood, MO 63126 | 8680/8704/8710 Pardee Lane | 116,400.00 | 66,755.66 | 183,155.66 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 68 | Joseph Batsch | Joseph Batsch<br>8700 Pardee Lane<br>Crestwood, MO 63126 | 8700 Pardee Lane | 65,400.00 | 37,507.04 | 102,907.04 |
| 69 | John & Shirlene Grigaitis | John & Shirlene Grigaitis<br>7811 Colleen Ave.<br>Affton, MO 63123 | 8904 Lou Ct. | 41,940.00 | 24,052.68 | 65,992.68 |
| 70 | Melvida Spalinger | Melvida Spalinger<br>8930 Ulysses Ct.<br>St. Louis, MO 63126 | 8930 Ulysses Ct. | 37,879.00 | 21,723.69 | 59,602.69 |
| 71 | David C. Wilson | David C. Wilson<br>8910 Lou Ct.<br>Crestwood, MO 63126 | 8910 Lou Ct. | 23,700.00 | 13,592.00 | 37,292.00 |
| 73 | Christopher H. & Mary Naunheim | Christopher H. Naunheim<br>8914 Lou Ct.<br>Crestwood, MO 63126 | 8914 Lou Ct. | 24,300.00 | 13,936.10 | 38,236.10 |
| 74 | DEM Truck Service, Inc. | Don Mahacek<br>DEM Truck Service, Inc.<br>9058 Fernald Drive<br>St. Louis, MO 63123 | 8745 Grant Rd. | 36,550.00 | 20,961.51 | 57,511.51 |
| 75 | Michael & Emily Hazelton | Michael & Emily Hazelton<br>8916 Burntoak<br>Crestwood, MO 63123 | 8918 Lou Ct. | 33,045.00 | 18,951.38 | 51,996.38 |
| 76 | Robert Suellentrop, Trustee of Lois D. Sullentrop Revocable Trust, dated October 28, 1986 | Robert Suellentrop<br>8313 Weber Trail Dr.<br>Crestwood, MO 63123 | 8922 Lou Ct.. | 17,700.00 | 10,150.99 | 27,850.99 |
| 77 | Harvey & Rebecca Hartzke | Harvey & Rebecca Hartzke<br>8977 Pardee<br>St. Louis, MO 63123 | 8977 Pardee | 34,925.00 | 20,029.56 | 54,954.56 |
| 78 | Borden, Inc. | Coleen Nissl<br>Hexion Specialty Chemicals, Inc.<br>180 E. Broad St.<br>Columbus, Ohio 43215 | 1200 Reco | 30,063.00 | 17,241.20 | 47,304.20 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 79 | Doris Cles Trust | Patricia Raposo<br>52 Hunting Manor Drive<br>St. Charles, MO 63303 | 1317 Trelane Ave. | 23,400.00 | 13,419.95 | 36,819.95 |
| 81 | Craig & Michelle Gravatte | Craig & Michelle Gravatte<br>336 Oakleigh Woods Drive<br>St. Louis, MO 63011 | 1041 Westglen | 10,500.00 | 6,021.77 | 16,521.77 |
| 82 | Dennis & Evelyn Grove | Dennis & Evelyn Grove<br>9240 Eddie & Park Road<br>St. Louis, MO 63126 | 165 Chatwood Terrace | 25,610.00 | 14,687.39 | 40,297.39 |
| 83 | William & Beatrice Human | William & Beatrice Human<br>13346 Fairfield Circle<br>Town & Country, MO 63017 | 9291 Watson Ind. Park | 30,000.00 | 17,205.07 | 47,205.07 |
| 84 | Leonard & Mary Kissel | Leonard & Mary Kissel<br>7946 Camelot<br>St. Louis, MO 63123 | 8926 Ulysses Ct. | 20,625.00 | 11,828.48 | 32,453.48 |
| 85 | John E. Maurer | John E. Maurer<br>513 Wildwood Lane<br>Naples, FL 34105 | 1355 Trelane Ave. | 13,000.00 | 7,455.53 | 20,455.53 |
| 86 | Judy K. Thomas, n/k/a Noll | Judy K. Noll<br>9108 Slater St.<br>Overland Park, KS 66212-3823 | 156 Chatwood Terrace | 19,000.00 | 10,896.54 | 29,896.54 |
| 87 | Shirley Eason, n/k/a Poticha | Shirley Poticha<br>4386 W. Pine, Unit 1E<br>St. Louis, MO 63108 | 1313 Trelane Ave. | 52,000.00 | 29,822.11 | 81,822.11 |
| 88 | Richard & Nicole Rief | Richard & Nicole Rief<br>571 Vista Hills Ct.<br>Eureka, MO 63205 | 173 Chatwood Terrace | 13,042.00 | 7,479.62 | 20,521.62 |
| 89 | Marvin Stuhlman & Margaret Stiegemeyer | Marvin Stuhlman & Margaret Stiegemeyer<br>5903 Deerwood Drive<br>St. Louis, MO 63123 | 1453 Trelane Ave. | 12,000.00 | 6,882.03 | 18,882.03 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 90 | Thomas & Dana Theiss | Thomas & Dana Theiss<br>14 Almeda Ct.<br>Fenton, MO 63026 | 185 Chatwood Terrace | 23,400.00 | 13,419.95 | 36,819.95 |
| 91 | Von Hoffman Corporation | Rodney Buckwalter<br>Visant Corporation<br>357 Main St., 1st Floor<br>Armonk, NY 10504 | 9900/10014 Big Bend | 643,500.00 | 369,048.66 | 1,012,548.66 |
| 94 | Michele Benya | Michele Benya<br>1447 Trelane<br>Crestwood, MO 63126 | 1447 Trelane | 15,200.00 | 8,717.23 | 23,917.23 |
| 95 | Van R. Brown | Van R. Brown<br>1613 Ridgewood Drive<br>Crestwood, MO 63126 | 1613 Ridgewood | 14,000.00 | 8,029.03 | 22,029.03 |
| 96 | John P. & Carole M. Degarmo | John P. & Carole M. Degarmo<br>34988 Monroe Road. 360<br>Monroe City, MO 63456-3406 | 9010 Watson Rd. | 52,250.00 | 29,965.49 | 82,215.49 |
| 97 | Marie Grimm | Marie Grimm<br>11095 Gravois Rd. Apt. 110-5<br>St. Louis, MO 63126 | 8922 Grantway Ct. | 25,200.00 | 14,452.26 | 39,652.26 |
| 98 | John V. Hagedorn & Mary Jo Hagedorn-Baur | John V. Hagedorn & Mary Jo Hagedorn-Baur<br>4604 Ambsdale Ct.<br>St. Louis, MO 63128-3081 | 161 Chatwood Terrace | 13,000.00 | 7,455.53 | 20,455.53 |
| 99 | Dennis Kneff | Dennis Kneff<br>1545 Shoppers Lane<br>St. Louis, MO 63126 | 1545 Shoppers Lane | 19,200.00 | 11,011.24 | 30,211.24 |
| 100 | Kupferer Brothers Ornamental Iron Works, Inc. | Michael P. Vessell<br>Kupferer Brothers Ornamental Iron Works, Inc.<br>8701 Grant Road<br>Crestwood, MO 63126 | 8701 Grant Road | 49,500.00 | 28,388.36 | 77,888.36 |
| 101 | Tom Kyle, Elizabeth Goble & Patricia Werner | Tom Kyle<br>9915 Heatherton Dr.<br>St. Louis, MO 63123 | 1723 Ridgewood | 18,000.00 | 10,323.04 | 28,323.04 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 101 | Tom Kyle, Elizabeth Goble & Patricia Werner | Patricia Werner<br>13231 Wintergreen Estate Dr.<br>Fenton, MO 63026 | 1723 Ridgewood | 18,000.00 | 10,323.04 | 28,323.04 |
| 101 | Tom Kyle, Elizabeth Goble & Patricia Werner | Elizabeth Goble<br>4356 Huff N' Puff Lane<br>Osage Beach, MO 65065 | 1723 Ridgewood | 18,000.00 | 10,323.04 | 28,323.04 |
| 102 | Lindbergh School District | Patrick Lanane<br>Lindbergh School District<br>4900 South Lindbergh Blvd.<br>St. Louis, MO 63126 | 1020 S. Sappington Rd. | 225,000.00 | 129,037.99 | 354,037.99 |
| 103 | Jerry M. & Carlie A. McMillian | Jerry & Carlie McMillian<br>8871 Sturdy Drive<br>Crestwood, MO 63126 | 1713 Ridgewood | 13,000.00 | 7,455.53 | 20,455.53 |
| 104 | Carlie McMillian as Personal Representative of Joyce A. Miller Estate | Carlie McMillian as Personal Representative of Joyce A. Miller Estate<br>8871 Sturdy Drive<br>Crestwood, MO 63126 | 1701 Ridgewood | 14,400.00 | 8,258.43 | 22,658.43 |
| 105 | Joseph & Mano Paiva | Joseph & Mano Paiva<br>4817 Danby Drive<br>Nashville, TN 37211-4448 | 1001 Westglen | 13,350.00 | 7,656.25 | 21,006.25 |
| 106 | Jeanna Mohseny, n/k/a Pey | Jeanna Pey<br>626 E. 5th<br>El Dorado, Arkansas 71730 | 1005 Westglen | 10,500.00 | 6,021.77 | 16,521.77 |
| 107 | PSAF Development Partners, Inc. | Amar Kharouf<br>PSAF Development Partners, Inc.<br>701 Western Ave.<br>Glendale, CA 91201 | 9030 Watson Rd. | 296,846.00 | 170,241.83 | 467,087.83 |
| 108 | Dula J. Rammacher | Dula J. Rammacher<br>8965 Pardee Road<br>Crestwood, MO 63126 | 8965 Pardee | 54,000.00 | 30,969.12 | 84,969.12 |
| 110 | Laura Jean Schneider | Laura Jean Schneider<br>941 Woodside Village Lane<br>Ballwin, MO 63021 | 1429 Trelane | 14,000.00 | 8,029.03 | 22,029.03 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 111 | Carl W. & Karen L. Spalinger | Carl & Karen Spalinger<br>8929 Ulysses<br>Crestwood, MO 63126 | 8929 Ulysses | 34,113.00 | 19,563.88 | 53,676.88 |
| 112 | Kathleen B. Sullivan | Kathleen B. Sullivan<br>1329 Trelane<br>Crestwood, MO 63126 | 1329 Trelane | 13,000.00 | 7,455.53 | 20,455.53 |
| 113 | David C. Treichel | David C. Treichel<br>7 Saint Elizabeth Ct.<br>O'Fallon, MO 63366-2188 | 1065 Westglen | 17,057.00 | 9,782.23 | 26,839.23 |
| 114 | Richard H. Wisniewski | Richard H. Wisniewski<br>8712 Pardee Lane<br>Crestwood, MO 63126 | 8712 Pardee | 30,000.00 | 17,205.07 | 47,205.07 |
| 115 | Zahnow Enterprises | Richard Zahnow<br>Zahnow Enterprises<br>661 Tarrymore Lane<br>St. Louis, MO 63122-3056 | 9215 Watson Ind. Park | 21,750.00 | 12,473.67 | 34,223.67 |
| 116 | Michael D. Zugmaier | Michael D. Zuhmaier<br>1905 Parkway Dr.<br>Bettendorf, IA 52722-3764 | 1441 Trelane | 14,000.00 | 8,029.03 | 22,029.03 |

30223
EB

SERVICE DATE - AUGUST 18, 1999

SURFACE TRANSPORTATION BOARD

DECISION AND NOTICE OF INTERIM TRAIL USE OR ABANDONMENT

STB Docket No. AB-33 (Sub-No. 135X)

UNION PACIFIC RAILROAD COMPANY--ABANDONMENT EXEMPTION--IN ST. LOUIS COUNTY, MO (KIRKWOOD INDUSTRIAL LEAD, KIRK JCT. TO BILLMAN SPUR)

Decided: August 11, 1999

By petition filed on April 30, 1999, Union Pacific Railroad Company (UP) seeks an exemption under 49 U.S.C. 10502 from the prior approval requirements of 49 U.S.C. 10903 to abandon a 2.18-mile portion of the Kirkwood Industrial Lead extending from milepost 13.62 near Kirk Jct. to the end of the line at milepost 15.80 near Billman Spur, in St. Louis County, MO. The rail station of Billman Spur at milepost 15.30 is included in the proposed abandonment. Notice of the institution of an exemption proceeding was published in the Federal Register at 64 FR 27617 on May 20, 1999. On June 7, 1999, Von Hoffman Press (Von Hoffman) filed a protest, objecting to abandonment of the portion extending between milepost 13.62 and 14.20 that serves its Crestwood facility. A request for issuance of a notice of interim trail use (NITU) and a public use condition was filed by Trailnet, Inc. (Trailnet). The City of Crestwood also seeks imposition of a public use condition. The United Transportation Union (UTU) requests imposition of labor protective conditions. We will grant the petition, subject to public use and standard labor protective conditions, and will issue a NITU.

## BACKGROUND

The Kirkwood Industrial Lead is a stub-ended rail line that connects to the UP main line which runs between St. Louis and Jefferson City, MO. Near milepost 13.62 the line crosses the tracks of The Burlington Northern and Santa Fe Railway Company (BNSF). UP seeks to abandon the line because, it asserts, the revenues are insufficient to justify the costs of operation and maintenance. These costs include the cost for maintenance of 5 signaled road crossings. The railroad says that there is no reasonable prospect that traffic and revenue will increase sufficiently in the foreseeable future to justify continued operation and maintenance. The line serves one shipper, Von Hoffman, located at milepost 14.20.

Service has been provided on an as-needed basis by a local switch train. In 1998, the train made 10 trips to deliver 14 carloads of traffic for the shipper. UP asserts that alternative transportation is available to the shipper over an extensive network of highways in the area.



EXHIBIT
2

Von Hoffman claims that its transportation costs would increase 62%, or $29,764 in the next year, if trucks were used for traffic now received by rail. Von Hoffman further claims that this substantial increase in costs would negatively impact any decision to increase production at its Crestwood facility. Using trucks instead of rail, Von Hoffman says, would substantially increase its transportation costs and decrease the value of its property.

TRAFFIC, REVENUES, AND COSTS

UP Witness Frank Zitek states that Von Hoffman, a manufacturer of school books, once used its Crestwood facility for manufacturing books, but now uses it as the company's corporate headquarters and as a production facility for book covers. Mr. Zitek says the majority of Von Hoffman's manufacturing is performed at its Jefferson City facility, to which UP also provides rail service in excess of 600 rail cars per year. According to Mr. Zitek, the only UP rail traffic that has moved to the Crestwood facility has been overflow cars of material destined for Von Hoffman's Jefferson City plant.

In the base year (calendar year 1998), UP claims that it handled 14 cars bound for Von Hoffman's Crestwood facility, of which 11 were waybilled in a 4-day time frame in March due to a Michigan supplier shipping faster than Von Hoffman's Jefferson City plant could absorb. To minimize demurrage charges at Jefferson City, UP says, Von Hoffman had the overflow cars sent to the Crestwood facility for truck movement to its Jefferson City facility. Mr. Zitek says that he has sought to remedy the occasional mismatch between supplier shipping frequency and the receiving capabilities at Jefferson City.

UP Witness Clarence Adamson states that almost all traffic received at Von Hoffman's Crestwood facility is in a reciprocal switch service for which UP receives $130 per car, but for which no line haul revenue is received. The rail cars carry printing paper received from other railroads (usually BNSF) at St. Louis. If UP is the line haul carrier, it would receive $1,797 per car for service to Von Hoffman's Crestwood facility.

Mr. Adamson indicates that traffic for Von Hoffman consisted of 4 carloads in 1996, 8 carloads in 1997 (7 in switch service and 1 in linehaul service); and 14 carloads in 1998 (13 in switch service and 1 in linehaul service). UP's revenues totaled $3,487 for the base year (January-December, 1998) and $2,707 in revenues for the forecast year (April 1999-March 2000). UP explains that the increase in traffic to the Crestwood facility in 1998 resulted from the diversion of cars that were headed to the Van Hoffman Jefferson City plant but which could not be accommodated. UP says that this diversion of cars is not expected to be repeated. Therefore, UP projects the traffic in the forecast year to be equivalent to the 1997 level (8 cars). We have restated UP's costs and revenue as shown in the Appendix. We have, however, calculated revenues for the forecast year at the 14-car level shown for the base year. This is the highest traffic level that the record will support. The only other adjustment we made to UP's cost evidence was to use the current 15.6% nominal rate of return.[1] Our restatement of the cost evidence for the entire 2.18-mile line shows that the line will generate an operating loss of $41,397 and an opportunity cost of $49,381 for a total forecast year avoidable loss of $90,778 and an estimated subsidy payment of $90,778.

UP argues that it must spend more to operate the line than it can earn from the revenues attributable to the line and, therefore, there is a burden on interstate commerce. In protesting the abandonment, Von Hoffman does not object to UP's abandoning its service between milepost 14.20 and the end of the line at milepost 15.80. Rather, the shipper objects to UP's justifying abandonment of the .58-mile segment of track to the Crestwood facility based on revenues and costs attributable to abandonment of the entire 2.18 miles of rail line. Protestant urges that UP be made to justify abandonment of the .58 miles of track by itself. Protestant states that maintaining .58 miles would obviously be less expensive than maintaining 2.18 miles. Protestant, however, offers no evidence that the .58-mile segment would be profitable if it remained in service.

When we examine the .58-mile segment by itself, we find that the avoidable costs alone (excluding opportunity costs) would exceed the revenues derived from operations. UP claims a cost for maintenance-of-way and structures (MOW) of $41,872 for the entire line. However, because we cannot determine from the record just where the 5 road crossings are located on the line, we will not include the cost of $29,364 for their maintenance in our calculation of MOW costs for the .58-mile segment. Accordingly, we have prorated the remaining MOW costs and calculate a MOW cost of $3,328 attributable to the .58-mile segment. Adding all other on-branch and off-branch costs[2] to the adjusted MOW results in an avoidable loss from operation of $2,853 for the .58 miles.

---

[1] The 15.6% pre-tax nominal cost of capital rate is determined from the after-tax cost of capital (10.7%). <u>See</u> <u>Railroad Cost of Capital--1998</u>, STB Ex Parte No. 558 (Sub-No. 2) (STB served May 17, 1999).

[2] On-branch costs are $93 for maintenance of equipment (including depreciation); $841 for transportation; $44 for freight car costs; $205 for return on value - locomotives; and $48 for

DISCUSSION AND CONCLUSIONS

Under 49 U.S.C. 10903, a rail line may not be abandoned without prior approval. Under 49 U.S.C. 10502, however, we must exempt a transaction or service from regulation when we find that: (1) continued regulation is not necessary to carry out the rail transportation policy of 49 U.S.C. 10101; and (2) either (a) the transaction or service is of limited scope, or (b) regulation is not necessary to protect shippers from the abuse of market power.

Detailed scrutiny under 49 U.S.C. 10903 is not necessary to carry out the rail transportation policy. By minimizing the administrative time and expense of the application process, an exemption will reduce regulatory barriers to exit [49 U.S.C. 10101(2) and (7)]. Moreover, an exemption will foster sound economic conditions and encourage efficient management by allowing UP to avoid operating and maintaining an uneconomic rail line and to use its assets more productively elsewhere on its system [49 U.S.C. 10101(3), (5) and (9)]. Other aspects of the rail transportation policy are not affected adversely.

Regulation of the transaction is not necessary to protect shippers from an abuse of market power. Von Hoffman, the only shipper that would be affected by the abandonment, seeks retention by UP of a .58-mile portion of the line proposed for abandonment. Von Hoffman does not oppose abandonment of the remaining portion of line. When we examine the record, however, the evidence demonstrates that continued operation of either the 2.18-mile or .58-mile portions would be a burden on the carrier and interstate commerce. UP would incur an operating loss of $41,397 to operate the 2.18-mile segment and an operating loss of at least $2,853 to operate the .58-mile portion. Under either scenario, UP's continued service would not be economically justified.

---

return on value - freight cars. Off-branch costs are $489 for off-branch costs other than return; $191 for return on value - freight cars; and $1,101 for switch cars. The total additional on-branch and off-branch costs are thus $3,012. [$3,012 (additional on-branch and off-branch costs) + $3,328 (MOW costs) - $3,487 (revenues) = $2,853 (avoidable loss).]

Because Von Hoffman moved most of its manufacturing from Crestwood to its Jefferson City plant, this abandonment will have little impact on it. Any adverse effects will be minor and do not outweigh the detriment to the public interest of continued uneconomic operations. Chicago & N.W. Transp. Co.--Aband., 354 I.C.C. 1, 7 (1977). To ensure that the shipper is informed of our decision, we will direct UP to serve a copy of this decision on Von Hoffman within 5 days of the service date of this decision and to certify to us that it has done so. Given our market power finding, we need not determine whether the proposed transaction is limited in scope.

Moreover, the abandonment would benefit the community interests because it would eliminate road crossings, which are hazardous to traffic and pedestrians. We find that UP has met the exemption criteria for the proposed abandonment.

We also note that 49 U.S.C. 10904 provides a mechanism for those who want to continue rail service that the Board has authorized to be discontinued or abandoned. Under section 10904, any financially responsible person (and all government agencies are deemed to be financially responsible) may file an offer of financial assistance (OFA) to acquire a line or subsidize the losses of the existing operator. Should area shippers or any other interested party determine that continued rail service over the line is in their best interest, they may avail themselves of the section 10904 procedures.

## LABOR PROTECTION

UTU requests the imposition of labor protective conditions. Under 49 U.S.C. 10502(g), we may not use our exemption authority to relieve a carrier of a statutory obligation to protect the interests of its employees. Accordingly, we will impose the employee protective conditions in Oregon Short Line R. Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979), as a condition to granting this exemption.

## ENVIRONMENTAL ISSUES

UP has submitted an environmental report with its petition and has notified the appropriate Federal, state, and local agencies of the opportunity to submit information concerning the energy and environmental impacts of the proposed abandonment. See 49 CFR 1105.11. Our Section of Environmental Analysis (SEA) has examined the environmental report, verified its data, and analyzed the probable effect of the proposed action on the quality of the human environment. SEA served an environmental assessment (EA) on June 29, 1999, recommending that no environmental or historic conditions be imposed on the abandonment. No comments have been received in response to the EA. Based on SEA's recommendation, we conclude that the proposed abandonment, if implemented, will not significantly affect either the quality of the human environment or conservation of energy resources.

TRAIL USE

Trailnet requests issuance of a NITU under the National Trails System Act, 16 U.S.C. 1247(d), for the right-of-way involved in this proceeding. They ask that UP be precluded from disposing of trail-related structures (e.g., bridges, trestles, culverts and tunnels) on the line. Trailnet requests a 180-day period to negotiate with UP for acquisition of the right-of-way, stating that the corridor would make an excellent recreational trail in accordance with local plans. As required, Trailnet submitted a statement of willingness to assume financial responsibility for the right-of-way and acknowledged that use of the right-of-way is subject to possible future reconstruction and reactivation of the right-of-way for rail service in compliance with 49 CFR 1152.29. By letter filed May 27, 1999, UP indicated its willingness to negotiate a trail use agreement with Trailnet.

The criteria for imposing trail use and rail banking have been met. Accordingly, we will accept the trail use request and UP's response and issue a NITU. The parties may negotiate an agreement during the 180-period prescribed below. If the parties reach a mutually acceptable final agreement, further Board approval is not necessary. If no agreement is reached within 180 days, UP may fully abandon the line, provided the conditions imposed in this proceeding are met. 49 CFR 1152.29(d)(1). Use of the right-of-way for trail purposes is subject to restoration for railroad purposes.

PUBLIC USE

SEA indicates in its EA that the right-of-way may be suitable for other public use after abandonment. Both Trailnet and Crestwood request imposition of a 180-day public use condition. Trailnet seeks to acquire the entire right-of-way for interim trail use in accordance with local plans. Crestwood seeks to acquire all or a portion of the right-of-way to protect and enhance the city-owned "Sappingon House Complex" which is listed in the National Register of Historic Places. Both Trailnet and city of Crestwood submit that 180 days are required to negotiate with UP.

Persons who file under the Trails Act also may file for public use under 49 U.S.C. 10905. When the need for both is established, it is our policy to impose them concurrently, subject to the execution of a trail use agreement. <u>See</u> <u>Rail Abandonments--Use of Rights-of-Way as Trails</u>, 2 I.C.C.2d 591, 609 (1986) (<u>Trails</u>). Trailnet and city of Crestwood have met the criteria for imposing a public use condition by specifying: (1) the condition sought; (2) the public importance of the condition; (3) the period of time for which the condition would be effective; and (4) justification for the time period. 49 CFR 1152.28(a)(2). Accordingly, a 180-day public use condition also will be imposed. If a trail use agreement is reached on a portion of the right-of-way, UP must keep the remaining right-of-way intact for the remainder of the 180-day period to permit public use negotiations. Also, we note that a public use condition is not imposed for

the benefit of any one potential purchaser, but rather to provide an opportunity for any interested person to acquire a right-of-way that has been found suitable for public purposes, including trail use. Therefore, with respect to the public use condition, UP is not required to deal exclusively with Trailnet and the Crestwood but may engage in negotiations with other interested persons.

The parties should note that operation of the trail and public use procedures could be delayed, or even foreclosed, by the financial assistance process under 49 U.S.C. 10904. As stated in Trails, 2 I.C.C.2d at 608, offers of financial assistance (OFA) to acquire rail lines for continued rail service or to subsidize rail operations take priority over interim trail use/rail-banking and public use. Accordingly, if an OFA is timely filed under 49 CFR 1152.27(c)(1), the effective date of this decision and notice will be postponed beyond the effective date indicated here. See 49 CFR 1152.27(e)(2). In addition, the effective date may be further postponed at later stages in the OFA process. See 49 CFR 1152.27(f). Finally, if the line is sold under the OFA procedures, the petition for abandonment exemption will be dismissed and trail and public use precluded. Alternatively, if a sale under the OFA procedures does not occur, trail and public use negotiations may proceed.

It is ordered:

1. Under 49 U.S.C. 10502, we exempt from the prior approval requirements of 49 U.S.C. 10903 the abandonment by UP of the above-described 2.18-mile rail line, subject to: (1) the employee protective conditions in Oregon Short Line R. Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979); (2) the condition that UP leave intact all of the right-of-way underlying the track, including bridges, trestles, culverts, and tunnels (but not track or track materials), for a period of 180 days from the effective date of this decision, to enable any State or local government agency or any other interested person to negotiate the acquisition of the line for public use; and (3) the requirement that UP comply with the terms and conditions for implementing interim trail use/rail banking, as set forth below.

2. UP must serve a copy of this decision on Von Hoffman within 5 days after the service date of this decision and certify to the Board that it has done so.

3. If an interim trail use/rail banking agreement is reached, it must require the trail user to assume, for the term of the agreement, full responsibility for management of, any legal liability arising out of the transfer or use of (unless the user is immune from liability, in which case it need only indemnify the railroad from any potential liability), and for the payment of any and all taxes that may be levied or assessed against, the right-of-way.

4. Interim trail use/rail banking is subject to the future restoration of rail service and to the user's continuing to meet the financial obligations for the right-of-way.

5. If interim trail use is implemented and subsequently the user intends to terminate trail use, it must send the Board a copy of this decision and notice and request that it be vacated on a specified date.

6. If an agreement for interim trail use/rail banking is reached by the 180th day after service of this decision and notice, interim trail use may be implemented. If no agreement is reached by that time, UP may fully abandon the line, provided the conditions imposed in this proceeding are met.

7. An OFA under 49 CFR 1152.27(c)(1)[3] to allow rail service to continue must be received by the railroad and the Board by August 27, 1999, subject to time extensions authorized under 49 CFR 1152.27(c)(1)(i)(C). The offeror must comply with 49 U.S.C. 10904 and 49 CFR 1152.27(c)(1). Each OFA must be accompanied by a $1,000 filing fee. See 49 CFR 1002.2(f)(25).

8. OFAs and related correspondence to the Board must refer to this proceeding. The following notation must be typed in bold face on the lower left-hand corner of the envelope: **"Office of Proceedings, AB-OFA."**

9. Provided no OFA has been received, this exemption will be effective on September 17, 1999. Petitions to stay must be filed by September 2, 1999. Petitions to reopen must be filed by September 13, 1999.

10. Pursuant to the provisions of 49 CFR 1152.29(e)(2), UP shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line. If consummation has not been effected by UP's filing of a notice of consummation by August 18, 2000, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. If any legal or regulatory barrier to consummation exists at the end of the 1-year period, the notice of consummation must be filed not later than 60 days after satisfaction, expiration or removal of the legal or regulatory barrier.

---

[3] See Abandonment and Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. 10903, STB Ex Parte No. 537 (STB served Dec. 24, 1996, and June 27, 1997).

STB Docket No. AB-33 (Sub-No. 135X)

By the Board, Chairman Morgan, Vice Chairman Clyburn and Commissioner Burkes.

Vernon A. Williams
Secretary

STB Docket No. AB-33 (Sub-No. 135X)

APPENDIX

| | Applicant's Base Year Figures | Applicant's Forecast Year Figures | Restated Forecast Year Figures |
|---|---|---|---|
| 1. Freight Orig. and/or Term. on Branch | $3,487 | $2,707 | $3,487 |
| 2. Bridge Traffic | 0 | 0 | 0 |
| 3. All Other Revenue and Income | 0 | 0 | 0 |
| 4. Total Attributable Revenue (Ls. 1 thru 3) | $3,487 | $2,707 | $3,487 |
| 5. On-branch Costs: | | | |
| a. Maintenance-of-Way and Structures | $41,255 | $41,872 | $41,872 |
| b. Maintenance-of-Equipment (Including Depreciation) | 93 | 93 | 93 |
| c. Transportation | 822 | 841 | 841 |
| d. General & Administrative | 0 | 0 | 0 |
| e. Deadheading, Taxi and Hotel | 0 | 0 | 0 |
| f. Overhead Movement | 0 | 0 | 0 |
| g. Freight Car Costs (Other Than Return) | 44 | 44 | 44 |
| h. Return on Value - Locomotives | 205 | 205 | 205 |
| i. Return on Value - Freight Cars | 48 | 48 | 48 |
| j. Revenue Taxes | 0 | 0 | 0 |
| k. Property Taxes | 0 | 0 | 0 |
| l. Total (Ls. 5a thru 5k) | $42,467 | $43,103 | $43,103 |
| m. Holding Gains - Locomotives | 0 | 0 | 0 |
| n. Holding Gains (Loss) - Freight Cars | 0 | 0 | 0 |
| o. Total On-branch Costs (Ls. 5l, 5m & 5n) | $42,467 | $43,103 | $43,103 |
| 6. Off-branch Costs: | | | |
| a. Off-Branch Costs (Other Than Return) | $483 | $489 | $489 |
| b. Return on Value - Freight Cars | 191 | 191 | 191 |
| c. Holding Gains - Freight Cars | 0 | 0 | 0 |
| d. Switch Cars | 1,101 | 606 | 1,101 |
| e. Total Off-branch Costs (Ls. 6a+6b-6c) | $1,775 | $1,286 | $1,781 |
| 7. Total Avoidable Costs (L. 5o + L. 6d) | $44,242 | $44,389 | [illegible] |
| 8. Rehabilitation | $0 | $0 | $0 |
| 9. Administrative Costs (Subsidy Year Only) | 35 | 27 | 0 |
| 10. Casualty Reserve Account | 0 | 0 | 0 |
| 11. Total Subsidization Cost (Ls. 8 thru 10) | $35 | $27 | $0 |
| 12. Valuation of Road Properties | | | |
| a. Working Capital | $1,693 | $1,719 | $1,719 |
| b. Income Tax Consequences | (221,404) | (220,856) | (220,856) |
| c. Net Liquidation Value | 598,390 | 596,907 | 596,907 |
| d. Total (Ls. 12a thru 12c) | $378,679 | $377,770 | $377,770 |
| 13. Nominal Rate of Return | 17.5% | 17.5% | 15.6% |
| 14. Nominal Return on Value (L. 12d x L. 13) | $66,269 | $66,110 | $58,932 |
| 15. Holding Gain (Loss) | $0 | $9,551 | $9,551 |
| 16. Total Return on Value (L. 14 - L. 15) | $66,269 | $56,559 | $49,381 |
| 17. Avoidable (Loss) or Profit from Operations (L. 4 - L. 7) | ($40,755) | ($41,682) | ($41,397) |
| 18. Avoidable (Loss) or Profit Including Return on Value (L. 4 - Ls. 7 & 16) | ($107,024) | ($98,241) | ($90,778) |
| 19. Estimated Subsidy Payment (L. 4 - Ls. 7, 11, & 16) | ($107,059) | ($98,268) | ($90,778) |

882-97

# DONATION AND PURCHASE AND SALE AGREEMENT

This Donation and Purchase and Sale Agreement is entered into this 26th day of July, 2001 ("Execution Date"), between UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, whose address is 1416 Dodge Street, Omaha, Nebraska 68179 ("Seller"), and TRAILNET, INC., a Missouri corporation, whose address is 3900 Reavis Barracks Road, St. Louis, Missouri 63125 ("Purchaser"), WITNESSETH:

IT IS MUTUALLY AGREED by and between the parties hereto as follows:

**Section 1. Donation and Purchase and Sale of the Property.**

Seller agrees to sell and donate and Purchaser agrees to purchase and accept, on the terms and conditions of this Agreement, Seller's right, title and interest in and to Seller's right-of-way in Kirkwood, Oakland and Crestwood, St. Louis County, Missouri, extending from Mile Post 13.766 to Mile Post 15.8 and shown on the print marked **Exhibit A**, attached hereto and hereby made a part hereof (the "Land"), together with any and all ballast, bridges and culverts thereon to the extent owned by Seller (the "Personal Property"). The Land and the Personal Property are hereafter sometimes collectively called the "Property".

EXCEPTING from this sale and donation and RESERVING unto Seller, its successors and assigns, forever, the trackage and appurtenances now located on the Property ("Trackage") but not including the Personal Property, subject to the provisions of Section 7.

The sale and donation made pursuant to this Agreement shall be subject to any and all applicable federal, state and local laws, orders, rules and regulations, and any and all outstanding rights.

**Section 2. Purchase Price.**

The purchase price for the Property is THREE HUNDRED THIRTY THOUSAND AND NO/100 DOLLARS ($330,000.00) ("Purchase Price"). The parties acknowledge that the fair market value of the Property exceeds the Purchase Price, and that the Property is being donated to Purchaser as a charitable contribution to the extent of such excess, as determined by the fair market value appraisal to be obtained by Seller prior to the transfer of the Property. Upon request of Seller, Purchaser agrees to execute and furnish to Seller Internal Revenue Service Form 8283 acknowledging receipt of the Property as a charitable contribution to the extent of such excess. The Purchase Price shall be paid by Purchaser to Seller at Closing.

**Section 3. Compliance with Trails Act.**

This Agreement is being entered into in accordance with and subject to the National Trails System Act, 16 U.S.C. §1247(d), and the terms and conditions contained in the Decision and Notice of Interim Trail Use or Abandonment served August 18, 1999 by the Surface Transportation Board in STB Docket No. AB-33 (Sub-No. 135x), as extended to August 18, 2001 ("Trails Use Certificate"). After Closing, Purchaser agrees to assume full responsibility

EXHIBIT 3

0005



06/21/01
G:\LAW\ADM\BMH\PSA\WP001\Trailnet_donationpsa#2.doc

for management of the Property and for any legal liability arising out of such transfer or use. Such responsibilities shall remain with Purchaser regardless of the result of any possible litigation which might challenge the Trails Use Certificate, the effect of the Trails Use Certificate or the Surface Transportation Board's jurisdiction or power to impose such Certificate. In the event reactivation of rail service (freight or passenger) upon the Property is necessary or desirable as determined by Seller, Purchaser agrees to transfer the Property back to Seller or Seller's successor (or, if agreed by Seller, to another railroad) by executing a Quitclaim Deed in recordable form and a Bill of Sale. After Purchaser is given notice of such reactivation, Purchaser will be allowed a reasonable amount of time not to exceed six (6) months to remove all personal property of Purchaser, by way of example and not by limitation, personal property items such as park benches shall remain the property of Purchaser and shall be removed. The provisions of this Section 3 shall survive the Closing and the delivery of the Deed.

Section 4. Conditions Precedent to Sale.

This Agreement is made and executed by the parties hereto subject to the following conditions precedent:

(a) Survey. Purchaser may elect, at its sole cost and expense, to obtain a survey of the Property. If Buyer so elects, Buyer shall furnish a copy of same, prepared and certified by a public surveyor registered in the State of Missouri, to Seller within thirty (30) days after the Execution Date. The survey, as approved by Purchaser and Seller, shall be used by Seller as the basis for preparation of the description of the Property. If a survey of the Property is not secured by Purchaser, the current records and maps of Seller shall be used by Seller as the basis for preparation of the description of the Property.

(b) Feasibility Studies. Upon execution of this Agreement, Purchaser, and its agents and contractors, are granted the privilege, commencing with the Execution Date and extending for a period of ninety (90) days thereafter ("Feasibility Review Period") of entering upon the Property for the purpose of performing environmental audits, soil tests, engineering and feasibility studies of the Property as Purchaser may deem necessary to determine the suitability of the soil conditions and other physical conditions of the Property. If the results of such audits, tests or studies, or Purchaser's review of the title to the Property, are unsatisfactory in Purchaser's reasonable opinion, Purchaser may, at its option, terminate this Agreement by giving Seller written notice of termination before expiration of the Feasibility Review Period. If no such written notice of termination is given by Purchaser to Seller before expiration of the Feasibility Review Period, the Property shall be deemed suitable for Purchaser's purposes. In the event of such termination by Purchaser, then Purchaser shall surrender to Seller copies of all audits, soils, engineering and any other reports prepared for Purchaser pertaining to the Property and said reports shall become the sole property of Seller without cost or expense of Seller (and the contents thereof shall be kept confidential by Purchaser and Purchaser's consultants), and this Agreement shall terminate and be without any further force and effect, and without further obligation of either party to the other. Regardless of whether or not this Agreement is terminated, Purchaser shall promptly furnish Seller with a copy of any and all reports on environmental assessments performed for the benefit of Purchaser.

In the event Purchaser, its agents or contractors, shall enter upon the Property for the purposes set forth in this Section 4(b), such entry shall be subject to the following terms and conditions:

(i) Purchaser agrees to indemnify and save harmless Seller and/or Seller's affiliates ("Seller's affiliates" means any corporation which directly or indirectly controls or is controlled by or is under common control with Seller), their officers, agents, servants and employees, against and from any and all liability, loss, costs and expense of whatsoever nature growing out of personal injury to or death of persons whomsoever, or loss or destruction of or damage to property whatsoever, where such personal injury, death, loss, destruction or damage arises in connection with or incident to the occupation or use of the Property by, or the presence thereon of Purchaser, Purchaser's agents, contractors, servants or licensees prior to Closing;

(ii) Purchaser covenants and agrees to pay in full for all materials joined or affixed to the Property and to pay in full all persons who perform labor upon said premises, and not to permit or suffer any mechanic's or materialman's lien of any kind or nature to be enforced against the Property for any work done or materials furnished thereon at the instance or request or on behalf of Purchaser; and Purchaser agrees to indemnify and hold harmless Seller against and from any and all liens, claims, demands, costs and expenses of whatsoever nature in any way connected with or growing out of such work done, labor performed or materials furnished prior to Closing;

(iii) In the event the sale and purchase of the Property does not close, Purchaser shall, as soon as possible and at Purchaser's sole expense, restore the Property to the same condition it was in immediately prior to the time Purchaser entered the Property, failing in which Seller may perform the work of restoration and Purchaser shall reimburse Seller for the cost and expense thereof within thirty (30) days after rendition of bill therefor by Seller; and

(iv) Notwithstanding any provisions in this Agreement to the contrary, in the event this Agreement is terminated for any reason whatsoever, Purchaser nevertheless shall be obligated to comply with the provisions of this Section 4(b).

(c) Seller's Management Approval. The terms and conditions of this transaction are subject to approval in accordance with Seller's Management Policy Statement. Notice of approval or disapproval shall be given by Seller to Purchaser within thirty (30) days after the Execution Date, and failure to give such notice within said time period shall be deemed notice of disapproval. In the event, within said time period, the terms of this Agreement are not approved in accordance with Seller's Management Policy Statement for any reason whatsoever, this Agreement shall be deemed terminated forthwith. In the event of such termination, this Agreement shall be without any further force and effect, and without further obligation of either party to the other.

(d) NITU. In the event the NITU applicable to the Property lapses, expires or is invalidated prior to Closing, this Agreement shall be deemed terminated forthwith. In the event

of such termination, this Agreement shall be without any further force and effect, and without further obligation of either party to the other.

Section 5. Escrow.

Upon execution of this Agreement by both parties, an escrow account shall be opened with First American Title of St. Louis, Inc., 7600 Forsyth Blvd., Clayton, Missouri 63105 ("Escrow Holder"), and Purchaser shall thereupon deposit with Escrow Holder a copy of this Agreement. On or before the Closing Date, Purchaser shall deposit with Escrow Holder the Purchase Price, and the Assignment and Assumption Agreement referred to in Section 7 as executed by Purchaser, and Seller shall deposit therein the Quitclaim Deed and Bill of Sale referred to in Section 6 and the Assignment and Assumption Agreement referred to in Section 7, as executed by Seller. Escrow Holder shall be instructed that when it is in a position to deliver to Seller the Purchase Price, Escrow Holder shall:

(a) record and deliver the Quitclaim Deed to Purchaser;

(b) deliver the Bill of Sale to Purchaser;

(c) deliver an executed counterpart of the Assignment and Assumption Agreement to each of Purchaser and Seller; and

(d) deliver to Seller the Purchase Price.

At Closing,

(a) Seller shall pay Seller's pro rata share of real estate taxes (whether general or special) assessed against the Property and due and payable for the year of closing.

(b) Purchaser shall pay the following costs:

(1) The escrow fee;

(2) The cost of recording the Quitclaim Deed;

(3) The premium for any title insurance Purchaser elects to obtain;

(4) The Missouri State real estate excise tax, if any;

(5) The cost of the required state revenue stamps, if any; and

(6) Purchaser's pro rata share of real estate taxes (whether general or special) assessed against the Property and due and payable for the year of closing.

Section 6. Transfer Documents.

(a) Seller's right, title and interest in and to the Land shall be transferred by Seller to Purchaser by a duly executed Quitclaim Deed in the form marked **Exhibit B**, attached hereto and hereby made a part hereof; and in the Personal Property by a duly executed Bill of Sale in the form marked **Exhibit C** attached hereto and hereby made a part hereof.

(b) Purchaser acknowledges that the Property may be subject to licenses and other third party rights that have not been disclosed by Seller to Purchaser. It is the responsibility of Purchaser to determine if any of these undisclosed rights exist. If any license that affects only the Property is identified after the Execution Date, Seller's rights (including, without limitation, any income) and obligations under such license will be assigned to and assumed by Purchaser at or after Closing.

(c) The Property is subject to two (2) Mortgages as follows:

(i) that certain First Mortgage dated January 1, 1955, executed by Missouri Pacific Railroad Company (Seller's predecessor in interest) in favor of The Boatmen's National Bank of St. Louis (now The Bank of New York, Successor Trustee); and

(ii) that certain General (Income) Mortgage dated January 1, 1955, executed by Missouri Pacific Railroad Company (Seller's predecessor in interest) in favor of Manufacturer's Trust Company (now The Chase Manhattan Bank, corporate successor Trustee) and Charles Herman (now Donnell Reid, individual successor Trustee).

It is understood and agreed that promptly upon Closing, application will be made to the respective Mortgage Trustees for the release of the Property from the liens of the two (2) Mortgages. Immediately upon receipt of the Partial Releases, the same will be forwarded to Escrow Holder. Seller agrees to indemnify and hold Purchaser harmless against failure to provide such Partial Releases.

Section 7. Assignment of Leases and Licenses.

Upon Closing, Seller shall assign or partially assign (as applicable) to Purchaser, and Purchaser shall assume or partially assume (as applicable), all of Seller's right, title and interest in and to the lease and license agreements (the "Leases and Licenses") set forth on **Exhibit B** to **Exhibit D**, including, without limitation, that certain Wireline Agreement (Longitudinal Encroachment) dated December 31, 1992 between Missouri Pacific Railroad Company (predecessor in interest to Seller) and Union Electric Company ("Licensee"), which by the terms of Article 7 thereof Licensee has the right to require Seller to convert to a permanent rights agreement. Such permanent rights agreement is currently being negotiated between Seller and Licensee for recording in St. Louis, Missouri. Purchaser hereby consents to such conversion and recordation.

The Leases and Licenses shall be assigned or partially assigned by Seller to Purchaser at Closing and assumed or partially assumed by Purchaser by duly executed Assignment and Assumption Agreement in the form attached hereto as **Exhibit D** and hereby made a part hereof. If one or more of the Leases and Licenses affect property in addition to the Property, the Assignment shall be effective only to partially assign Seller's interest in such Lease or License to the extent that any such Lease or License pertains to the Property. Rentals and other payments under Leases and Licenses which are fully assigned to Purchaser shall be prorated between Seller and Purchaser as of the Closing Date, and rentals and other payments under the Licenses which are partially assigned shall be allocated between Seller and Purchaser on a proportionate basis.

**Section 8. Closing; Possession.**

Escrow for the Property shall close ("Close" or "Closing") within thirty (30) days after expiration of the Feasibility Review Period ("Closing Date"). Possession of the Property shall pass to Purchaser on Closing of escrow. Purchaser shall have no right to possession or occupancy of or entry upon any portion of the Property [except as set forth in Section 4(b)] and title thereto shall be and remain vested in Seller until Closing of escrow.

**Section 9. Post-Sale Trackage Removal Condition.**

Within one (1) year after Closing, Seller, at its sole cost and expense, shall remove or cause to be removed the Trackage from the Property and repair or cause to be repaired any public crossings disrupted by such removal to the extent required by applicable governmental ordinances, laws, rules or regulations (collectively, the "Work"). Purchaser shall provide Seller and its contractors with reasonable access to the Property for purposes of performing the Work. Seller agrees to indemnify and hold harmless Purchaser from and against any and all liability, loss, costs and expenses caused by the presence on or about the Property of Seller or its contractors during the performance of the Work, except to the extent arising out of the negligence or willful misconduct of Purchaser. Seller further agrees to pay in full for all labor and materials furnished Seller for the Work, and not to permit any mechanic's or materialman's liens to be enforced against the Property for the Work.

**Section 10. As Is; Release.**

(a) Purchaser and its representatives, prior to the Closing Date, will have been afforded the opportunity to make such inspections of the Property and matters related thereto as Purchaser and its representatives desire. Purchaser acknowledges and agrees that the Property is to be sold and conveyed to and accepted by Purchaser in an "as is" condition with all faults. Purchaser further acknowledges that the Property was used for an industrial lead track. Seller makes no representation or warranties of any kind whatsoever, either express or implied, with respect to the Property; in particular, but without limitation, Seller makes no representations or warranties with respect to the use, condition, title, occupation or management of the Property, or compliance with applicable statutes, laws, codes, ordinances, regulations, requirements, covenants, conditions and restrictions (whether or not of record). Purchaser acknowledges that it is entering into this Agreement on the basis of Purchaser's own investigation of the physical and

environmental conditions of the Property, including the subsurface conditions, and Purchaser assumes the risk that adverse physical and environmental conditions may not have been revealed by its investigation. Purchaser acknowledges that notwithstanding any prior or contemporaneous oral or written representations, statements, documents or understandings, this Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and the purchase and sale of the Property and supersedes any such prior or contemporaneous oral or written representations, statements, documents or understandings.

(b) Purchaser, for itself, its successors and assigns, hereby waives, releases, remises, acquits and forever discharges Seller, its affiliates, their employees, agents, officers, successors and assigns, of and from any and all claims, suits, actions, causes of action, demands, rights, damages, costs, expenses, penalties, fines or compensation whatsoever, direct or indirect, which Purchaser now has or which Purchaser may have in the future on account of or in any way arising out of or in connection with the known or unknown physical or environmental condition of the Property (including, without limitation, any contamination in, on, under or adjacent to the Property by any hazardous or toxic substance or material), or any federal, state or local law, ordinance, rule or regulation applicable thereto, including, without limitation, the Toxic Substances Control Act, the Comprehensive Environmental Response, Compensation and Liability Act, and the Resource Conservation and Recovery Act.

<u>Section 11</u>. <u>Notices</u>.

Any notices required or desired to be given under this Agreement shall be in writing and personally served, given by overnight express delivery, or given by mail. Telecopy notices shall be deemed valid only to the extent they are (a) actually received by the individual to whom addressed and (b) followed by delivery of actual notice in the manner described above within three (3) business days thereafter. Any notice given by mail shall be sent, postage prepaid, by certified mail, return receipt requested, addressed to the party to receive at the following address or at such other address as the party may from time to time direct in writing:

Seller:

UNION PACIFIC RAILROAD COMPANY
ATTN: Mike Passo
1800 Farnam Street
Omaha, Nebraska 68102
Telephone: (402) 997-3643
Facsimile: (402) 997-3601/3602

With copy to:

UNION PACIFIC RAILROAD COMPANY
ATTN: Real Estate Attorney
1416 Dodge Street, Room 830
Omaha, Nebraska 68179
Telephone: (402) 271-5761
Facsimile: (402) 271-5610 or 271-7107

Purchaser: TRAILNET, INC.
ATTN: Ted Curtis
3900 Reavis Barracks Road
St. Louis, Missouri 63125
Telephone: (314) 436-1324 ext. 105
Facsimile: (314) 416-9928

Escrow Holder: FIRST AMERICAN TITLE OF ST. LOUIS, INC.
ATTN: Carol Rombauer
7600 Forsyth Blvd.
Clayton, Missouri 63105
Telephone: (314) 727-8131
Facsimile: (314) 727-4602

Express delivery notices shall be deemed to be given upon receipt. Postal notices shall be deemed to be given three (3) days after deposit with the United States Postal Service. Copies of all notices to Seller or Purchaser shall be given to Escrow Holder, and copies of all notices to Escrow Holder shall be given to the other party to this Agreement.

**Section 12. Assignment.**

Purchaser shall not transfer or assign this Agreement, or any interest therein, without the consent in writing of Seller, and it is agreed that any such transfer or assignment, whether voluntary, by operation of law or otherwise, without such consent in writing, shall be absolutely void and shall, at the option of Seller, terminate this Agreement. Nothing in this Section 12 shall preclude Purchaser from transferring the Property after Closing and no approval shall be required of Seller.

**Section 13. Waiver of Breach.**

A waiver by either party hereto of a breach by the other party hereto of any covenant or condition of this Agreement shall not impair the right of the party not in default to avail itself of any subsequent breach thereof. Leniency, delay or failure of either party to insist upon strict performance of any agreement, covenant or condition of this Agreement, or to exercise any right herein given in any one or more instances, shall not be construed as a waiver or relinquishment of any such agreement, covenant, condition or right.

**Section 14. Time of the Essence.**

Time is of the essence of this Agreement.

**Section 15. Law Governing.**

This Agreement shall be governed in all respects by the laws of the State of Missouri.

**Section 16. Merger.**

The terms, provisions, covenants and conditions herein contained shall merge into the deed to be delivered by Seller to Purchaser at closing and shall not survive the Closing, except for the provisions of Section 4(b), 8, 9, 17 and 19.

**Section 17. No Brokers.**

The negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by the parties without the intervention of any person which would give rise to any valid claim against either of the parties hereto for brokerage commissions or other like payment. Each party hereto shall indemnify and hold harmless the other party against and from any and all claims for brokerage commission or other like payment arising out of the transaction contemplated by this Agreement and occasioned by the actions of such indemnifying party.

**Section 18. Successors and Assigns.**

Subject to the provisions of Section 12, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

**Section 19. Special Provision.**

Seller, Federal ID No. 94-6001323, is not a foreign corporation and withholding of Federal Income Tax from the amount realized will not be made by Purchaser. A certification prepared in conformance with IRS regulations under Section 1445 of the Internal Revenue Code is attached as **Exhibit E**.

**Section 20. Entire Agreement.**

It is understood and agreed that all understandings and agreements, whether written or oral, heretofore had between the parties hereto are merged in this Agreement, which alone fully and completely expresses their agreement, that neither party is relying upon any statement or representation not embodied in this Agreement, made by the other, and that this Agreement may not be changed except by an instrument in writing signed by both parties.

882-97

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in duplicate as of the date first herein written.

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation

By: ______________________
Title: Assistant Vice President

TRAILNET, INC., a Missouri corporation

By: C. T. Curtis
Title: Executive Director

# UNION PACIFIC RAILROAD COMPANY
St. Louis County, Missouri

## EXHIBIT "A"

A TRACT OF LAND 100 FEET WIDE, AS SHOWN ON MISSOURI PACIFIC RAILROAD RIGHT OF WAY AND TRACT MAP PAGES V-1-D-MO. PAGE 1, DATED OCTOBER, 1917 IN PART OF U. S. SURVEY 2994, IN PART OF U. S. SURVEY 9 AND IN PART OF U. S. SURVEY 1936, AND IN PART OF SECTION 7, TOWNSHIP 44 NORTH, RANGE 6 EAST, ST. LOUIS COUNTY, MISSOURI, THE CENTERLINE OF SAID 100 FEET WIDE STRIP OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT FROM WHICH THE CENTERLINE OF PARDEE ROAD BEARS SOUTH 50 DEGREES EAST A DISTANCE OF 100 FEET MORE OR LESS, AT APPROXIMATE CENTERLINE STATION 143+48, SAID POINT BEING IN THE CENTERLINE OF MISSOURI PACIFIC RAILROAD, AS SHOWN ON SAID RIGHT OF WAY AND TRACT MAP, THENCE ALONG THE SAID CENTERLINE OF MISSOURI PACIFIC RAILROAD IN A NORTHWESTERLY DIRECTION, NORTH 50 DEGREES WEST A DISTANCE OF 2757 FEET TO A POINT BEING CENTERLINE P. T. STATION 115+91; THENCE ALONG A CURVE TO LEFT HAVING A RADIUS OF 1432.4 FEET A ARC DISTANCE OF 1187.9 FEET AND A CENTRAL ANGLE OF 47 DEGREES 31 MINUTES TO A POINT BEING CENTERLINE P. C. STATION 104+03.1; THENCE CONTINUING ALONG SAID CENTERLINE, IN A WESTERLY DIRECTION, A DISTANCE OF 982 FEET TO A POINT BEING CENTERLINE P. T. STATION 94+21.1; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1909.9 FEET A ARC DISTANCE OF 788.9 FEET AND A CENTRAL ANGLE OF 23 DEGREES 40 MINUTES TO A POINT BEING CENTERLINE P. C. STATION 86+32.2; THENCE CONTINUING ALONG SAID CENTERLINE, IN A WESTERLY DIRECTION, A DISTANCE OF 1784.9 FEET TO A POINT BEING CENTERLINE P. T. STATION 68+47.3; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1909.9 FEET A ARC DISTANCE OF 1248.9 FEET AND A CENTRAL ANGLE OF 37 DEGREES 28 MINUTES TO A POINT BEING CENTERLINE P. C. C. STATION 55+98.4; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1621.6 FEET A ARC DISTANCE OF 467.9 FEET AND A CENTRAL ANGLE OF 16 DEGREES 32 MINUTES TO A POINT BEING CENTERLINE P. C. STATION 51+30.5; THENCE CONTINUING ALONG SAID CENTERLINE, IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 1206.7 FEET TO A POINT BEING CENTERLINE P. T. STATION 39+23.8; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 3337.6 FEET A ARC DISTANCE OF 472.8 FEET AND A CENTRAL ANGLE OF 1 DEGREES 43 MINUTES TO A POINT BEING CENTERLINE P. C. C. STATION 34+51; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 887.8 FEET TO A POINT IN THE SOUTHEAST RIGHT-OF-WAY LINE OF BURLINGTON NORTHERN RAILROAD.

Containing 20.14 Acres more or less.

OFFICE OF REAL ESTATE
OMAHA, NEBRASKA
882-97

882-97

## EXHIBIT B

**AFTER RECORDING, RETURN TO:**

TRAILNET, INC.
ATTN: Ted Curtis
3900 Reavis Barracks Road
St. Louis, Missouri 63125

(Space Above for Recorder's Use Only)

## QUITCLAIM DEED

UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, Grantor (successor in interest to Union Pacific Railroad Company, a Utah corporation, and Missouri Pacific Railroad Company) in consideration of the sum of Ten Dollars ($10.00), and other valuable consideration to it duly paid, the receipt whereof is hereby acknowledged, does hereby REMISE, RELEASE and forever QUITCLAIM unto TRAILNET, INC., a Missouri corporation, Grantee, whose address is 3900 Reavis Barracks Road, St. Louis, Missouri 63125, and unto its successors and assigns forever, all of Grantor's right, title, interest, estate, claim and demand, both at law and in equity, of, in, and to the real estate and right-of-way of that portion of Grantor's Kirkwood Industrial Lead from Milepost 13.766 to Milepost 15,8, as such right-of-way is located in Kirkwood, Oakland and Crestwood, St. Louis County, Missouri, and as more particularly described in **Exhibit** A hereto attached and hereby made a part hereof (hereinafter the "Property).

EXCEPTING from this quitclaim and donation and RESERVING unto Grantor, its successors and assigns, the trackage and appurtenances thereto now located on the Property, but not including ballast, bridges and culverts.

This Deed is made subject to the terms and conditions contained in the Decision and Notice of Interim Trail Use or Abandonment served by the Surface Transportation Board on August 18, 1999, in Docket No. AB-33 (Sub-No. 135X), as extended to August 18, 2001, including but not limited to, the rail-bank interim trail use condition imposed in said Decision pursuant to the National Trails System Act, 16 U.S.C. 1247(d), 49 CFR 1152.29.

TOGETHER with all and singular the hereditaments and appurtenances thereunto belonging; TO HAVE AND TO HOLD, subject to the aforesaid provisions, the Property unto the said Grantee and unto its successors and assigns.

882-97

IN WITNESS WHEREOF, the Grantor has caused this deed to be duly executed as of the ____ day of ____________________, 2001.

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation

Attest:

By______________________________
Title:____________________________

______________________________
Assistant Secretary

(Seal)

882-97

ACKNOWLEDGMENT

STATE OF NEBRASKA )
) ss.
COUNTY OF DOUGLAS )

On this ____ day of ____________, 2001, before me, a Notary Public in and for said County and State, personally appeared ____________________ and ____________________ who are the ________________________________ and the Assistant Secretary, respectively, of UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, and who are personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to in the within instrument, and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

WITNESS my hand and official seal.

______________________________
Notary Public

(Seal)

882-97

EXHIBIT A TO EXHIBIT B

LEGAL DESCRIPTION OF PROPERTY
TO BE ATTACHED

882-97

EXHIBIT C

BILL OF SALE

UNION PACIFIC RAILROAD COMPANY, a Delaware corporation ("Seller"), successor in interest to Union Pacific Railroad Company, a Utah corporation, and Missouri Pacific Railroad Company, for and in consideration of Ten Dollars ($10.00) and other valuable consideration does hereby sell, transfer and deliver to TRAILNET, INC., a Missouri corporation ("Purchaser"), its successors and assigns, the following described personal property, to wit:

All ballast, bridges and culverts owned by Seller and located on the real property located in Kirkwood, Oakland and Crestwood, St. Louis County, Missouri, as such real property is described in **Exhibit A**, hereto attached and hereby made a part hereof (the "Personal Property").

This Bill of Sale is made subject to the terms and conditions contained in the Decision and Notice of Interim Trail Use imposed by the Surface Transportation Board ("STB") in a decision served August 18, 1999 in STB Docket No. AB-33 (Sub-No. 135X) as extended to August 18, 2001.

SELLER, BY THIS INSTRUMENT, MAKES NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AND FURTHER MAKES NO WARRANTY AS TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IT BEING UNDERSTOOD THAT THE PURCHASER IS PURCHASING THE PERSONAL PROPERTY DESCRIBED ABOVE IN AN "AS IS" AND "WHERE IS" CONDITION WITH ALL FAULTS.

IN WITNESS WHEREOF, the Seller and Purchaser have each duly executed this instrument as of the _____ day of _________________, 2001.

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation

By: ______________________________
Title:

TRAILNET, INC., a Missouri corporation

By: ______________________________
Title:

882-97

**EXHIBIT A TO EXHIBIT C**

**LEGAL DESCRIPTION OF REAL PROPERTY
TO BE ATTACHED**

882-97

# EXHIBIT D

## ASSIGNMENT AND ASSUMPTION AGREEMENT

FOR VALUE RECEIVED, UNION PACIFIC RAILROAD COMPANY, a Delaware corporation ("Assignor"), has ASSIGNED AND TRANSFERRED, and by these presents does ASSIGN AND TRANSFER unto TRAILNET, INC., a Missouri corporation, whose address is 3900 Reavis Barracks Road, St. Louis, Missouri 63125 ("Assignee"), all of Assignor's right, title and interest in and to the leases and licenses ("Leases and Licenses") now or hereafter affecting the real property (the "Property") described on **Exhibit A**, which Leases and Licenses and all amendments thereto are described on **Exhibit B**.

TO HAVE AND TO HOLD THE LEASES AND LICENSES unto Assignee, its successors and assigns. This Assignment is made and accepted without recourse against Assignor as to the performance by any party under such Leases and Licenses.

Assignee agrees to (a) perform all of the obligations of Assignor pursuant to the Leases and Licenses accruing after the date hereof, and (b) indemnify and hold Assignor harmless from and against any and all claims, causes of actions and expenses (including reasonable attorney's fees) incurred by Assignor and arising out of (1) Assignee's failure to comply with terms of the Leases and Licenses after the date hereof, and (2) claims under the Leases and Licenses by the lessees and/or licensees named in the Leases and Licenses accruing after the date hereof.

All exhibits attached to this Agreement are incorporated herein for all purposes.

The covenants, agreements, representations, and warranties contained herein shall inure to and be binding upon the parties, their heirs, successors and assigns.

DATED the _______ day of ______________________, 2001.

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation

By:_______________________________
Title:_____________________________

TRAILNET, INC., a Missouri corporation

By:_______________________________
Title:_____________________________

882-97

# EXHIBIT A TO EXHIBIT D

## LEGAL DESCRIPTION OF PROPERTY TO BE ATTACHED

882-97

## EXHIBIT B TO EXHIBIT D

## LIST OF LEASES AND LICENSE(S) TO BE ASSIGNED

882-97

**EXHIBIT E**

**CERTIFICATION OF NON-FOREIGN STATUS**

Under Section 1445(e) of the Internal Revenue Code, a corporation, partnership, trust, or estate must withhold tax with respect to certain transfers of property if a holder of an interest in the entity is a foreign person. To inform the transferee, TRAILNET, INC., that no withholding is required with respect to the transfer of a U.S. real property interest by UNION PACIFIC RAILROAD COMPANY, the undersigned hereby certifies the following on behalf of UNION PACIFIC RAILROAD COMPANY:

1. UNION PACIFIC RAILROAD COMPANY is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. UNION PACIFIC RAILROAD COMPANY'S U.S. employer identification number is 94-6001323; and

3. UNION PACIFIC RAILROAD COMPANY'S office address is 1416 Dodge Street, Omaha, Nebraska 68179, and place of incorporation is Delaware.

UNION PACIFIC RAILROAD COMPANY agrees to inform the transferee if it becomes a foreign person at any time during the three-year period immediately following the date of this notice.

UNION PACIFIC RAILROAD COMPANY understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of UNION PACIFIC RAILROAD COMPANY.

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation

By:____________________________
Title:____________________________
Date:____________________________

Original

FIRST AMENDMENT TO DONATION AND PURCHASE AND SALE AGREEMENT

THIS FIRST AMENDMENT TO DONATION AND PURCHASE AND SALE AGREEMENT is made and entered into as of the 26th day of September, 2001, by and between UNION PACIFIC RAILROAD COMPANY, a Delaware corporation ("Seller"), and TRAILNET, INC., a Missouri corporation ("Purchaser"), and amends that certain Donation and Purchase and Sale Agreement dated July 26, 2001 (the "Agreement"), for the sale and donation of certain real property located on Seller's right-of-way in Kirkwood, Oakland and Crestwood, St. Louis County, Missouri, extending from Mile Post 13.766 to Mile Post 15.8 as more particularly described therein (the "Property").

* * * * * * * * * * *

IT IS MUTUALLY AGREED by and between Seller and Purchaser as follows:

Section 1. Escrow Holder. The Escrow Holder for this Agreement has been changed to Commonwealth Land Title Insurance Company, 7980 Clayton Road, Suite 101, St. Louis, Missouri 63117, Telephone: (314) 781-1504 and Facsimile: (314) 781-5451. Any reference to Escrow Holder in said Agreement will refer to Commonwealth Land Title Insurance Company.

Section 2. Facsimile Execution. This First Amendment may be executed in facsimile counterparts which shall be effective as an original.

Section 3. Amendment Supplemental. This First Amendment is supplemental to the Agreement, and nothing herein contained shall be construed as amending or modifying the same, except as herein specifically provided. In the event of any conflict between the terms of this First Amendment and the terms of the Agreement, the terms of this First Amendment shall prevail. Except as expressly provided herein, all of the terms, covenants and conditions contained in the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Donation and Purchase and Sale Agreement as of the date first above written.

SELLER:

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation

By: [signature]
Title: Director - Real Estate

PURCHASER:

TRAILNET INC., a Missouri corporation

By: [signature]
Title: Executive Director